## PEOPLE v COLLINS

1. CRIMINAL LAW—VENUE—CHANGE OF VENUE—DISCRETION.

A trial court may properly defer determination on a request for a change of venue in a criminal case until an attempt has been made to select a jury in the county where the crime occurred, and to follow this established rule is not an abuse of discretion.

2. HOMICIDE—MURDER—VENUE—CHANGE OF VENUE—DISCRETION.

Denying defendant a change of venue because of pretrial publicity was not an abuse of discretion where the murder with which defendant was charged occurred on or about July 23, 1969, the bulk of the pretrial publicity occurred in that year, the jury selection process ran from June 2 to July 9, 1970, with the jurors being examined generally and individually, defense counsel, with three peremptory challenges remaining, announced, "We have a jury", there was no showing that the publicity adverse to defendant continued up to and through the trial, pervading the proceedings, or that the news media interfered with pretrial or trial proceedings, which both sides conceded were conducted with exemplary decorum, where the trial judge found that there was no strong community feeling or a pattern of deep and bitter prejudice against defendant, and the record failed to demonstrate that defendant had an unfair trial by a partial jury or that the verdict of guilty was based on evidence outside the record.

3. CRIMINAL LAW—IDENTIFICATION—ADMISSIBILITY.

Permitting in-court identification of a defendant by two prosecution witnesses was not error where the trial court found at a hearing on a motion to suppress that the witnesses were able to identify the defendant as the man they had seen with a girl before her disappearance by observations separate and distinct

---

REFERENCES FOR POINTS IN HEADNOTES

[1, 2] 21 Am Jur 2d, Criminal Law § 409 *et seq.*

[3] 21 Am Jur 2d, Criminal Law § 334.

[4, 5] 31 Am Jur 2d, Expert and Opinion Evidence § 181 *et seq.*

[6] 31 Am Jur 2d, Expert and Opinion Evidence §§ 39–41.

Consideration, in determining facts, of inadmissible hearsay evidence introduced without objection, 79 ALR2d 890.

from photographs shown to them by police after defendant's arrest and where the finding is supported by the record.

4. HOMICIDE—MURDER—EVIDENCE—HAIR—NEUTRON ACTIVATION ANALYSIS.

Expert testimony that, with a high degree of probability, hair recovered from a murder victim's pants came from the same source as hair found on the basement floor in the home of defendant's uncle, to which defendant had the key, was properly admitted where defendant did not question the validity of neutron activation analysis used by the witness in comparing the hairs, and did not claim that the witness was not a qualified expert, that the witness's analysis procedure was improper, or that the equipment used by the witness was defective or was used improperly; defendant's arguments that the expert used only five components in a hair sample and at least ten are required; that in analysis of a mixture of hair, as here, the mixture must be of known proportions and here the proportions were unknown go to the weight, not the admissibility, of the expert testimony.

5. HOMICIDE—MURDER—EVIDENCE—HAIR—MICROSCOPIC ANALYSIS.

A prosecution witness's expert opinion, based on reasonable scientific certainty and his microscopic examination, that hairs which he removed from a murder victim's pants and hairs found on the basement floor in the home of defendant's uncle, to which defendant had the key, had a common origin was properly admitted where a defense witness testified that the inability to identify hair samples by microscopic analysis was universally recognized, but then stated that, based upon his microscopic analysis, the hairs from the pants and from the basement floor were not the same; defendant's objection to the expert testimony went to its weight rather than to its admissibility.

6. HOMICIDE—MURDER—EVIDENCE—HAIR—EXPERT TESTIMONY—STATISTICAL PROBABILITIES.

An opinion by an expert in neutron activation analysis that hairs from a murder victim's pants were remarkably similar to hairs from the basement floor in the home of defendant's uncle, to which defendant had the key, and that there was an indication of high probability that the hairs had a common origin, should not have been admitted where his opinion was based upon the opinion testimony of another prosecution witness qualified in neutron activation analysis; however, the admission of the second expert's statistical probability testimony was not revers-

ible error where the testimony corroborated the people's other evidence supporting the theory that the murder had occurred in the basement and that the victim was last seen in the company of defendant who had access to the basement.

Appeal from Washtenaw, John W. Conlin, J. Submitted Division 1 October 3, 1972, at Lansing. (Docket No. 10896.) Decided October 24, 1972. Leave to appeal applied for.

John Norman Collins was convicted of first-degree murder. Defendant appeals. Affirmed.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *William H. Delhey,* Prosecuting Attorney, and *John J. Hensel,* Assistant Prosecuting Attorney, for the people.

*Joseph W. Louisell* and *Neil H. Fink,* for defendant.

Before: QUINN, P. J., and McGREGOR and VAN VALKENBURG,* JJ.

QUINN, P. J. Charged with the first-degree murder of Karen Sue Beineman, defendant was convicted by jury verdict of that offense. He was sentenced and his motion for new trial was denied and he appeals.

The appeal raises the following issues:

1. Did the trial court commit reversible error by denying defendant's various motions for change of venue?

2. Did impermissible pretrial identification procedure taint in-court identification testimony to the extent that it should have been excluded?

3. Was defendant identified in a lineup in the absence of his attorney?

---

* Former circuit judge, sitting on the Court of Appeals by assignment pursuant to Const 1963, art 6, § 23 as amended in 1968.

4. Was testimony concerning neutron activation analysis of hair samples inadmissible?

5. Was testimony concerning microscopic analysis of hair samples inadmissible?

6. Is the failure of the trial court to define the term "premeditation" in its jury instructions reversible error?

Facts pertinent to the issues raised will be stated in connection with a discussion of those issues.

MCLA 762.7; MSA 28.850 governs change of venue in criminal cases. Grant or denial of the requested change is discretionary. The exercise of that discretion is reviewable, but there must be a definite, clear showing of abuse of discretion for an appellate court to overturn the action of the trial court, *People v Freeman,* 16 Mich App 63, 71, 72 (1969).

There are two facets to defendant's claim of error in the denial of his motions for change of venue. First, in view of the pretrial publicity in this case, defendant says it was an abuse of discretion to attempt to draw a jury in Washtenaw County. Since *People v Swift,* 172 Mich 473 (1912), it has been the rule that it is proper for a trial court to defer determination on a request for a change of venue until an attempt has been made to select a jury in the county where the crime occurred. Defendant has not cited, nor has independent research disclosed, any authority which overrules *Swift.* Following an established rule is not an abuse of discretion.

Secondly, does this record demonstrate that denial of change of venue was a definite, clear abuse of discretion? Our answer is no, and it is based on the following:

1. The crime occurred on or about July 23, 1969.

The bulk of the pretrial publicity complained of occurred in 1969. Jury selection commenced June 2, 1970 and trial commenced July 20, 1970.

2. A jury selection process was conducted meticulously, running from June 2, 1970 to July 9, 1970, and the voir dire examination transcript comprises 12 volumes. After general questioning of the entire panel of jurors, each prospective juror was examined individually alone. At a point in the jury selection process when he had three peremptory challenges remaining, defendant announced through his counsel, "We have a jury".

3. There is no showing of publicity adverse to defendant which continued up to and through the trial and which pervaded the trial. There is no showing that the news media interfered with pretrial or trial proceedings, which both sides concede were conducted with exemplary decorum.

4. The trial court found that there was no strong community feeling or a pattern of deep and bitter prejudice against defendant and the record does not establish that this finding was clearly erroneous, GCR 1963, 517.1.

5. The record does not demonstrate that defendant had an unfair trial by a partial jury nor that the verdict of guilty was based on evidence outside the record.

Prior to trial, defendant moved to suppress any in-court identification testimony by witnesses Goshe and Spaulding. The basis of the motion was that prior impermissible identification procedure tainted any in-court identification to the extent it was inadmissible. The impermissible procedure was that the police showed photographs of defendant to these witnesses after his arrest, prior to a lineup and in the absence of defendant's attorney. At the hearing on this motion testimony was

taken. The trial court denied the motion to suppress on the finding that the witnesses were able to identify defendant from observations separate and distinct from the photographs. The record supports the finding of the trial court and it was not error to permit witnesses Goshe and Spaulding to identify defendant in court.

Defendant's contention that he was identified at a lineup when the attorney was not present is not supported by the record.

It was the theory of the people that the crime was committed at the home of Sergeant David Leik, a member of the Michigan State Police and an uncle of defendant. The Leiks were on vacation from July 18 to July 29, 1969, and they left a key to the house under the doormat to the side door so defendant could feed the Leik dog. A spot of blood found under some black paint on the basement floor was determined to be type A. The victim's blood was type A. Hairs found on the floor of the Leik basement were compared with hairs found on the pants of the victim by a process known as neutron activation analysis.[1] The neutron activation analysis of the hairs was performed by Howard Schlesinger.

Prior to trial, defendant moved to suppress the testimony of Howard Schlesinger. At the hearing on this motion, extensive testimony was taken on behalf of defendant and the prosecution. The motion to suppress was denied. Howard Schlesinger testified at trial that with a distinct and high level of probability the hair recovered from decedent's pants came from the same source as hair found on the floor of the Leik basement. Defendant asserts that this was reversible error.

---

[1] A detailed description of the process may be found at 15 Am Jur Proof of Facts, commencing at page 115.

Defendant does not question the validity of neutron activation analysis as a reliable technique. Defendant does not claim that Howard Schlesinger was not a qualified expert witness, that his analysis procedure was improper, that the equipment used was defective or was used improperly. In fact, defendant's expert indicated that the technique employed by Schlesinger was the generally accepted technique. Defendant's claim of error is based on two arguments. First, in order to be accurate, neutron activation analysis must compare at least ten components in a hair sample out of a possible 18 to 20 components. Schlesinger used only five components. Secondly, where the analysis is of a mixture of hair, as here, the mixture must be of known proportions, and the proportions of the mixture involved were unknown.

We note that defendant's expert employed the Schlesinger data in reaching a conclusion contrary to that of Schlesinger. We have examined the authorities relied on by defendant to establish the error asserted, and we find none which holds that the expert's testimony is inadmissible for the reasons here advanced. The arguments of defendant go to the weight of the Schlesinger testimony, not to its admissibility. It was proper to receive the Schlesinger testimony.

Dr. Guinn testified after Howard Schlesinger. Error is claimed with respect to this testimony, but we defer consideration of this claim of error until we have disposed of the error asserted with respect to witness Holz.

Walter Holz is chief of the criminalistics division of the crime detection laboratory at the Michigan Department of Health. He conducted a microscopic examination of hairs he removed from the victim's pants and hairs from the Leik basement floor.

Over objection, Holz gave his opinion based on reasonable scientific certainty that the hairs removed from the pants and the hairs from the Leik basement floor had a common origin. His opinion was based solely on what he saw through the microscope.

There is testimony to the effect that the inability to identify hair samples by microscopic analysis is universally recognized, but the same witness who gave that testimony stated after microscopic analysis that the hair from the pants was not the same as the hair from the Leik basement floor. We conclude, as did the trial court, that defendant's objection to the Holz testimony went to its weight rather than to its admissibility, and error in its admission is not established.

After being qualified as an expert in neutron activation analysis, Dr. Guinn testified at some length concerning conclusions he had reached and the method of reaching them from working with the data produced by Mr. Schlesinger. Dr. Guinn stated that the hairs from the pants were remarkably similar to the hairs from the Leik basement floor. He stated that there was an indication of high probability that the hairs had a common origin.

Dr. Guinn testified as to making graphs to illustrate his calculations respecting the Schlesinger data. One graph was marked people's exhibit no. 70. After the witness described what the graph portrayed, the prosecuting attorney moved its admission in evidence. At this point, defense counsel stated: "I suggest that these be taken subject to objection later, to find out if the people upon whom he relies actually support his conclusion". The witness then testified in detail as to the methods he used to reach certain statistical proba-

bilities with respect to the hair involved. When the prosecuting attorney asked the witness for his conclusions, defense counsel stated:

"Your Honor, I have to state for the record that I am going to object to any statistical probability when the data upon which the man relies was compiled by men who are in total disagreement with him.

"I don't think it is fair to introduce that in court. He is relying on people's data that was compiled by extensive research, and these people totally and personally contradict what he says.

"So, I don't think an expert can come in and rely on another expert that doesn't support him personally."

The court overruled the objection and defense counsel stated:

"Will you take it subject to finding out whether Dr. Jervis approves of this or not?"

The trial court indicated that he would so take the testimony.

The direct examination of this witness was completed and it contained the objected-to statistical probability testimony. After a brief cross-examination, defense counsel moved as follows:

1. To strike the Holz testimony.

2. To strike the testimony of witnesses Schlesinger and Guinn and "particularly I would move to strike Dr. Guinn's probabilities".

The trial court denied both motions and we have heretofore sustained that action with respect to the Holz and Schlesinger testimony. We have not disposed of the challenge to the Guinn testimony.

We sustain the trial court's denial of the motion to strike Guinn's testimony, except as that motion related to exhibits 70 through 77 (the graphs) and his statistical probability testimony. We do so for

two reasons, namely: it was not objected to and defendant's motion to strike indicates his real concern was with the probability testimony.

As to the graphs and the statistical probability testimony, counsel have cited no Michigan authority on the admissibility of statistical probability testimony and independent research has disclosed none. Out-of-state authorities are cited by counsel in support of their respective positions on this issue. It is not necessary to discuss those authorities nor the arguments advanced by counsel for their respective positions. Dr. Guinn's opinion testimony on statistical probability was based in part on the opinion testimony of Schlesinger, another expert. This is not permissible, *People v Bowen,* 165 Mich 231, 240 (1911); 2 Wharton's Criminal Evidence (12th ed), § 522, p 350.

Was the error in not striking Dr. Guinn's statistical probability testimony reversible error? That testimony corroborated the people's evidence supporting the theory that the crime occurred in the Leik basement. If the jury chose to believe it, there was evidence that the victim was last seen in the company of defendant who had access to the Leik home. If the jury chose to believe witnesses Holz, Schlesinger and Guinn as to the similarity of hair samples found on the Leik basement floor and the victim's pants and comparison of her blood with the spot of blood removed from the floor, there was basis for the jury to find that the victim was in the Leik home. Such a finding was permissible and sustainable without the Guinn testimony. In our view, improperly admitted testimony that is merely corroborative of properly admitted evidence is not the basis for holding the error reversible, MCLA 769.26; MSA 28.1096; GCR 1963, 529.1; *People v Budd,* 279 Mich 110 (1937); *People v Wolke,* 10 Mich App 582 (1968).

Finally, defendant claims reversible error because the trial court failed to define premeditation in the jury instructions. *People v Bodley,* 38 Mich App 27, 32 (1972) disposes of this issue contrary to defendant's contention.

Affirmed.

All concurred.