## PEOPLE v HAGGART

Docket No. 68645. Submitted June 6, 1984, at Grand Rapids.—Decided May 6, 1985. Leave to appeal applied for.

Robert L. Haggart was convicted of six counts of first-degree murder, one count of second-degree murder, one count of assault with intent to murder and eight counts of felony-firearm, Midland Circuit Court, Tyrone Gillespie, J. The charges were originally brought in the Clare Circuit Court, and venue

REFERENCES FOR POINTS IN HEADNOTES

[1] 21 Am Jur 2d, Criminal Law §§ 389, 402.

21A Am Jur 2d, Criminal Law §§ 688, 841.

Pretrial publicity in criminal case as affecting defendant's right to fair trial—federal cases. 10 L Ed 2d 1243.

Pretrial publicity in criminal case as ground for change of venue. 33 ALR3d 17.

Hostile sentiment or prejudice as ground for continuance of criminal trial. 39 ALR2d 1314.

Interrogation or poll of jurors, during criminal trial, as to whether they have read newspaper articles pertaining to alleged crime or trial. 15 ALR2d 1152.

[2] 21A Am Jur 2d, Criminal Law § 985.

[3] 21A Am Jur 2d, Criminal Law §§ 890-900.

Separation of jury in criminal case during trial—modern cases. 72 ALR3d 131.

Separation of jury in criminal case before introduction of evidence —modern cases. 72 ALR3d 100.

[4] 31 Am Jur 2d, Expert and Opinion Evidence § 42.

Admissibility, as against hearsay objection, of report of tests or experiments carried out by independent third party. 19 ALR3d 1008.

[5] 75 Am Jur 2d, Trial § 604 et seq.

[6] 40 Am Jur 2d, Homicide § 570.

[7] 31 Am Jur 2d, Expert and Opinion Evidence §§ 122-124.

Use of medical or other scientific treatises in cross-examination of expert witness. 60 ALR2d 77.

[8] 21 Am Jur 2d, Criminal Law § 244.

Limitations under double jeopardy clause of Fifth Amendment upon state criminal prosecutions—Supreme Court cases. 25 L Ed 2d 968.

[9] 79 Am Jur 2d, Weapons and Firearms § 1 et seq.

was subsequently changed to the Midland Circuit. Defendant appealed raising numerous issues. *Held:*

1. Defendant claimed he was denied due process and an impartial jury because of the pretrial publicity in Midland County. The existence of pretrial publicity itself is not dispositive. Defendant must show a pattern of strong community feeling or bitter prejudice against him and publicity so extensive that jurors could not remain impartial when exposed to it. Review of the record, including the fact that defendant did not exhaust his peremptory challenges, failed to show an abuse of discretion in laying venue in the Midland Circuit.

2. The decision of whether or not to sequester the jury in a criminal trial is within the discretion of the trial court. The record does not show an abuse of discretion in the trial court's decision not to sequester the jury.

3. The testimony of a blood-typing expert as to what another expert's results were from an analysis of blood samples was properly admitted. An expert witness may testify to an opinion based on hearsay information.

4. A review of the record does not reveal any error requiring reversal in the prosecutor's argument or in the jury instructions on first-degree murder.

5. Whether the giving of a particular jury instruction requires reversal of a defendant's conviction depends on whether it was prejudicial. The jury instruction on assault with intent to commit murder was not prejudicial to defendant. Intent to kill is an element of assault with intent to commit murder.

6. Testimony by expert witnesses in criminal cases regarding novel scientific evidence which will aid in identifying a defendant may be admitted so long as it is established that the evidence has achieved general scientific acceptance among impartial and disinterested experts in its field. The error of allowing the admission of evidence of an electrophoretic blood analysis prior to the laying of a proper foundation was rendered harmless by the later introduction of evidence concerning its general scientific acceptance.

7. The felony-firearm statute permits only a single conviction in a single criminal transaction regardless of the number of firearms possessed, felonies committed or attempted by the defendant.

Affirmed in part and seven of defendant's felony-firearm convictions vacated.

1. CRIMINAL LAW — CHANGE OF VENUE — PRETRIAL PUBLICITY.

The existence of pretrial publicity does not by itself require a

change of venue; if jurors can lay aside their impressions or opinions and render a verdict based on the evidence presented in court, a change of venue is not necessary; for a change of venue to be granted, the defendant must demonstrate that there has been a pattern of strong community feeling or bitter prejudice against him and the publicity must be so extensive and inflammatory that jurors could not remain impartial when exposed to it.

2. CRIMINAL LAW — DUE PROCESS — IMPARTIAL JURY — APPEAL.

Failure of a defendant to exhaust all of his peremptory challenges does not per se preclude him from assigning as error on appeal a denial of due process and an impartial jury but it is a factor to be considered in considering the merit of his claim.

3. CRIMINAL LAW — SEQUESTRATION OF JURY.

The decision of whether or not to sequester the jury in a criminal trial is within the discretion of the trial court.

4. WITNESSES — EXPERT WITNESSES — HEARSAY — RULES OF EVIDENCE.

An expert witness may testify to an opinion based on hearsay information (MRE 703).

5. CRIMINAL LAW — JURY INSTRUCTIONS.

Whether the giving of a particular jury instruction requires reversal of a defendant's conviction depends on whether it was prejudicial.

6. ASSAULT AND BATTERY — ASSAULT WITH INTENT TO MURDER — INTENT.

Actual intent to kill must be proven to support a conviction of assault with intent to commit murder.

7. CRIMINAL LAW — EXPERT WITNESSES — SCIENTIFIC EVIDENCE.

Testimony by expert witnesses in criminal cases regarding novel scientific evidence which will aid in identifying a defendant may be admitted so long as it is established that the evidence has achieved general scientific acceptance among impartial and disinterested experts in its field.

8. CRIMINAL LAW — CONSTITUTIONAL LAW — DOUBLE JEOPARDY — MULTIPLE PUNISHMENT.

The question what punishment is constitutionally permissible in a case where the issue is purely multiple punishments and not successive prosecutions is no different from the question of what punishment the legislative branch intended to be imposed (US Const, Am V, XIV; Const 1963, art 1, § 15).

9. CRIMINAL LAW — FELONY-FIREARM — DOUBLE JEOPARDY — MULTI-
PLE PUNISHMENT.
    The felony-firearm statute permits only a single conviction in a
    single criminal transaction regardless of the number of fire-
    arms possessed or felonies committed or attempted by the
    defendant (MCL 750.227[b][1]; MSA 28.424[2][1]).

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *Thomas P. McLaughlin, Jr.,* Prosecuting Attorney, and *Leonard J. Malinowski,* Assistant Attorney General, for the people.

*F. Martin Tieber,* Assistant State Appellate Defender, for defendant on appeal.

Before: J. H. GILLIS, P.J., and M. J. KELLY and C. H. MULLEN,* JJ.

C. H. MULLEN, J. On October 8, 1982, defendant was convicted by a jury of six counts of first-degree murder, MCL 750.316; MSA 28.548, one count of second-degree murder, MCL 750.317; MSA 28.549, one count of assault with intent to commit murder, MCL 750.83; MSA 28.278, and eight separate counts of possessing a firearm during the commission of the above eight felonies (felony-firearm), MCL 750.227b; MSA 28.424(2). He was sentenced to serve life imprisonment for the murder convictions, 30 to 50 years imprisonment for the assault conviction and eight two-year terms for the felony-firearm convictions. He now appeals as a matter of right.

On Tuesday, February 16, 1982, at approximately 6:30 p.m., seven people were savagely killed and one assaulted on a small farm located in Farwell, Michigan. The victims were defendant's estranged wife, Garnetta Haggart, his fa-

_____
    * Circuit judge, sitting on the Court of Appeals by assignment.

ther- and mother-in-law, George and Vaudrey Post, his sister-in-law, Helen Gaffney, and Helen Gaffney's four children: Angela Gaffney, Amy Jo Gaffney, Tommy Gaffney, and Amanda Sue Gaffney. Only Amanda Sue Gaffney survived the multiple shootings which occurred on that chilly February evening.

No one actually witnessed the shootings, other than, perhaps, 14-month-old Amanda Sue; hence, the prosecution's case was largely developed from circumstantial evidence. Nevertheless, the evidence against the defendant was overwhelming.

Two weapons were used during the ordeal, a 20-gauge shotgun and a .38-caliber nickel-plated Smith & Wesson revolver. Two of the victims, Angela and Amy Jo Gaffney, each received separate gunshot wounds to the head from the .38-caliber revolver, while the remaining murder victims died from shotgun wounds.

Defendant raises eight issues for our review. We will address them either in turn or together.

## I and II

Defendant first contends that he was denied due process and an impartial jury because the trial judge removed the case from Clare County, where the crimes occurred, to neighboring Midland County for trial. To support his argument, defendant cites massive pretrial publicity within the Midland County area as tainting his ability to receive a fair trial in that county.

The existence of pretrial publicity alone does not necessitate a change of venue. *People v Prast (On Rehearing),* 114 Mich App 469, 477; 319 NW2d 627 (1982).

"If jurors can lay aside their impressions or opinions

and render a verdict based on the evidence presented in court, a change of venue is not necessary. *Irvin v Dowd,* 366 US 717, 722-723; 81 S Ct 1639; 6 L Ed 2d 751 (1961), *[People v] Swift* [172 Mich 473, 481-482; 138 NW 662 (1912)], *People v Dixon,* 84 Mich App 675, 679; 270 NW2d 488 (1978). For a change of venue to be granted, the defendant must demonstrate that there is a pattern of strong community feeling or bitter prejudice against him, and the publicity must be so extensive and inflammatory that jurors could not remain impartial when exposed to it. *People v Clay* [95 Mich App 152, 160; 289 NW2d 888 (1980); *People v Collins,* 43 Mich App 259, 262; 204 NW2d 290 (1972)]."

Our examination of the jury voir dire reveals that no prejudice occurred in the selection and make-up of the jury.

Over a period of four days, the trial court and counsel took a considerable amount of time and energy to seat a jury. The trial court asked the prospective jurors whether any of them had seen or heard so much of the media coverage as to feel that they could not, respectively, sit as an impartial member of the jury. Through this lengthy process, the court asked each potential juror questions relating to four areas: First, whether or not the person had been exposed to media coverage. Second, whether the person had formed an opinion of defendant's guilt or innocence before coming to court. Third, whether the person could remain impartial despite having been exposed to this coverage, including inquiries into how much information the person had retained from the articles and broadcasts he or she read, watched or heard. And, finally, the court asked the person if he or she would be willing and able to refrain from watching or listening to broadcasts and reading articles about the trial if selected as a juror. All of the persons eventually selected as jurors answered these questions in a satisfactory manner.

Throughout the voir dire, the trial court emphasized to counsel that it would be predisposed to dismissing prospective jurors for cause if requested to do so. Likewise, whenever a prospective juror stated that he or she recently read an article concerning the crimes or the pretrial proceedings, he or she was immediately dismissed for cause by the trial court. Furthermore, defendant did not utilize four of his remaining peremptory challenges. Defense counsel specifically stated, "Your Honor, I should officially on the record say that I am satisfied with the jury even though I have four peremptories left". Although a defendant's failure to utilize all of his peremptory challenges will not per se preclude him from assigning error on appeal, it is a factor to be considered in showing that the jury was satisfactory when finally impaneled. *People v Stockard,* 391 Mich 481; 219 NW2d 68 (1974). Finally, all of the jurors stated, without reservation, that they could lay aside their impressions or opinions about the case and render a verdict based only upon the evidence introduced at trial.

On these facts, although we do not endorse laying venue in a county where there has been a great deal of pretrial publicity, we find no abuse of discretion in locating defendant's trial in Midland County.

Next, defendant contends that the trial court erred in not sequestering the jury vis-à-vis the publicity occurring in Midland County about the crimes and the trial. Again we find no prejudice.

During voir dire, each juror told the trial court that he or she would avoid being exposed to media coverage if selected as a juror. During trial, the trial court instructed the jury not to talk about, read or listen to the media coverage regarding the crime or the trial. The jurors were also instructed

not to speak with anyone about the case while it was pending. There has been no showing that these instructions were not followed or that the jurors did not avoid media coverage during the pendency of the case.

Considering the length of the trial, 22 days, and the cautionary instructions given, we find no abuse of the trial court's discretion in not sequestering the jury.

## III

Next, defendant argues that the people's blood-typing expert was erroneously allowed to testify regarding what a second expert's results were after conducting an electrophoresis examination on blood samples taken from defendant's blue jeans. Defendant claimed at trial that the results were hearsay.

Assuming *arguendo* that the "results" are hearsay (*i.e.,* that the testing procedures involved non-verbal conduct of a person intended by the person as an assertion and offered to prove the truth of the matter asserted, MRE 801, subds [a] and [c]) we find no error.

The witness explained that his results were the same as the out-of-court expert's results. He did not testify that his interpretations of the results were the same as the out-of-court expert's interpretations. The basis of the witness' opinion was the materials observed after the tests had been performed by the out-of-court expert. This testimony was permissible under MRE 703. This is true even if the underlying facts or data involved some hearsay information. See *Swanek v Hutzel Hospital,* 115 Mich App 254, 260; 320 NW2d 234 (1982), and the cases cited therein.

Later, however, on recross-examination, defense

counsel elicited testimony from the people's expert that the interpretations of the results were likewise the same for both experts. Since this error was invited, we will not reverse on this ground.

## IV

Defendant argues that various remarks made by the prosecution denied him a fair trial. We have reviewed the specific remarks alleged to be prejudicial and, in context, find defendant's argument to be without merit.

## V

Defendant next contends that the trial court's instructions on the elements of first-degree murder failed to adequately define deliberation and, therefore, the jury lacked adequate guidance on the distinction between first- and second-degree murder. We disagree.

It is axiomatic that a defendant has a right to have a properly instructed jury pass upon the evidence. *People v Visel,* 275 Mich 77, 81; 265 NW 781 (1936). However, whether the giving of instruction constitutes reversible error depends upon whether it was prejudicial. *People v Woods,* 416 Mich 581, 600-601; 331 NW2d 707 (1982), *reh den* 417 Mich 1113 (1983).

In this case, the trial judge did instruct the jury on the element of deliberation for first-degree murder. Nevertheless, defendant charges that, at other times, the trial court excluded a discussion of deliberation when such element should have been given to the jury. Defendant cites "[o]f major import is the chart which the jury was given to refer to during [its] deliberations, which entirely omitted the crucial aspect of deliberation". Al-

though we do not condone the jurors' use of a chart which fails to articulate adequately every element of the charged offense, we deem the lack of the deliberation element on the chart in this instance nonprejudicial to defendant. The trial court did instruct the jury on this element before the jury left the courtroom to consider defendant's case. Accordingly, the erroneous exclusion of the definition of deliberation on the jurors' chart was nothing more than harmless error. GCR 1963, 529.1.

## VI

Defendant claims that the trial court's instructions on assault with intent to commit murder were erroneous. We disagree.

The trial judge instructed the jury as follows:

*"[The Court:]* The defendant is, in Count VIII, charged with the crime of assault with intent to murder in connection with Mandy Gaffney, the infant who survived.

"There is a statute in the State of Michigan which reads in part: Any person who shall assault another with intent to commit the crime of murder, shall be guilty of a felony.

"The defendant also pleads not guilty to this charge. To establish this charge the prosecution must prove the following beyond a reasonable doubt:

"That there was an assault. The intentional firing of a firearm at a person within range is an assault.

"That there was a specific intent to murder Mandy Gaffney or some person in the pickup with her.

"Three, that the assault was one which, if it had caused a death, would have been murder.

"The specific intent to commit the crime of assault to commit murder need not be directed toward Mandy Gaffney, but must have been present and directed towards the murder of someone in the pickup. Michigan

law requires that the intent must have been to commit murder and not some lesser crime, such as manslaughter or simple assault, but the law does not distinguish between first degree murder and second degree murder to establish this charge.

"Specific intent is a necessary element of the crime of assault with intent to commit murder. The crime cannot have been committed when the intent did not exist.

"Again, I point out that intent is a decision of the mind to knowingly do an act with a conscious objective of accomplishing a certain result.

"There can be no crime of assault with intent to commit murder under our law where there is no intent to commit murder, and the burden rests upon the prosecution to show beyond a reasonable doubt that the defendant at the time of doing the alleged act had that wrongful intent.

"I repeat, again, that the intent with which a person does an act is known by the way in which he expresses it to others or indicated it by his conduct. The intent with which a person does an act can be determined from the manner in which it is done, the method used and all other facts and circumstances, but only if that intent is established by the evidence.

"If you find that the defendant, for any reason whatsoever, did not knowingly and consciously act with intent to murder an occupant of the pickup, the crime cannot have been committed and you must find the defendant not guilty of the crime of assault with intent to commit murder.

"If from all of the evidence you have a reasonable doubt as to whether or not the defendant knowingly and consciously acted with the intent to murder an occupant of the Gaffney pickup, then you must find the defendant not guilty of the crime of assault with intent to commit murder."

To support a conviction of assault with intent to commit murder, MCL 750.83; MSA 28.278, the actual intent to kill must be proven beyond a reasonable doubt. *People v Crawford,* 128 Mich App 537, 539; 340 NW2d 323 (1983), *lv den* 418

Mich 956 (1984). See also 2 CJI, Assault Commentary, pp 17-23 to 17-26A (Supp 2/83).

Murder requires a killing. It follows, therefore, that one who "intends to murder" intends to kill. One can murder someone without possessing the specific intent to kill; however, the same is not true with respect to the offense of assault with intent to commit murder. The distinction between the two offenses was set forth early on in this jurisdiction in *Roberts v People,* 19 Mich 401, 415 (1870), as follows:

"This case, so far as regards the intention to kill, is not identical with that of murder. To find the defendant guilty of the whole charge, it is true, the jury must find the intent to kill under circumstances which would have made the killing murder—and it is not denied that had death ensued in the present case, it would have been murder. But the converse of the proposition does not necessarily follow; that, because the killing would have been murder, therefore there must have been an intention to kill. Murder may be and often is committed without any specific or actual intention to kill. See instances stated in 1 *Bish. Cr. Law. Sec.* 412 *and* 667. And no such specific intent is therefore necessary to be found. This difference was recognized in *Maher v. The People,* [10 Mich 212 (1862)] above cited."

The present instructions, although not precise,[1]

---

[1] A much better and more precise instruction for assault with intent to commit murder may be found in 2 CJI 17:2:01, p 17-19 (Supp 2/83). It provides in relevant part as follows:

"(1) The defendant is charged with the crime of assault with intent to murder. Any person who shall assault another with intent to commit the crime of murder is guilty of this crime.

"(2) The defendant pleads not guilty to this charge. To establish this charge the prosecution must prove each of the following elements beyond a reasonable doubt:

"(3) First, that the defendant tried to physically injure another person.

"(4) Second, that he had the present ability to cause an injury, or at least believed that he had the present ability.

adequately apprised the jury of its duty; *viz.,* to find defendant guilty of assault with intent to commit murder if it found that defendant intended to murder *(i.e.,* kill) Mandy Gaffney.

*Crawford, supra,* relied upon by defendant, is distinguishable. There the trial judge went a step further; he also instructed the jurors on the different kinds of malice aforethought required for murder. Thus, in *Crawford,* the instruction authorized the jurors to convict the defendant of assault with intent to commit murder upon a finding that he either (1) intended to kill the victims, (2) intended to do them great bodily harm, or (3) intended to commit a wanton and willful act the natural tendency of which was to cause them death or great bodily harm. This, of course, was erroneous. Here, on the other hand, for the assault with intent to commit murder charge, no instruction on malice was given. Accordingly, we find that the instruction as given was not prejudicial to defendant.

## VII

Next, defendant claims error in the trial court's admission of a "novel method of electrophoretic blood analysis" at his trial because the prosecution failed to lay a proper foundation for the evidence. The substance of defendant's contention is that serological electrophoretic analysis has not yet achieved general scientific acceptance for reliability to be admissible to include an accused within the class of possible perpetrators of a crime. The

"(5) Third, that at the time he committed the assault the defendant intended to kill the complainant, under circumstances that did not justify, excuse or mitigate the crime." (Footnote omitted.)

We suggest that this instruction, or one similar to it, be given in order to highlight that the intent required for this offense is one "to kill". See Administrative Order 1977-1, 399 Mich lxxii.

question is especially novel here because it was not only defendant's blood which was included in the testing but also the blood of one of the victims which was allegedly found as a stain on a pair of defendant's blue jeans.

Recently, in *People v Young,* 418 Mich 1, 17-25; 340 NW2d 805 (1983), the Supreme Court addressed the admissibility of this kind of blood analysis evidence. There, the Court reiterated the requirement that "[t]he admissibility of scientific evidence in this state is governed by the so-called *Davis-Frye* rule".[2] The purpose of this rule "is to prevent the jury from relying on unproven and ultimately unsound scientific methods". *People v Gonzales,* 415 Mich 615, 623; 329 NW2d 743 (1982).

Although the Court in *Young* did not doubt that the technique of electrophoresis enjoys general acceptance as a diagnostic and a research tool, it nevertheless remanded the case to the trial court for an evidentiary hearing on the question of the technique's reliability because "the record before [it was] devoid of impartial and disinterested expert opinion that serological electrophoresis is sensitive and specific in measuring what it purports to measure". 418 Mich 22. In doing so, the Court also noted the "apparent growing controversy over the procedure's reliability". *Id.,* p 22, fn 9 (citing *State v Washington,* 229 Kan 47; 622 P2d 986 [1981]). The Court concluded:

"We hold that the admissibility of novel scientific evidence is governed by the *Davis-Frye* standard. Such evidence must have achieved general scientific acceptance among impartial and disinterested experts. In this case, we are unable to determine from the record before us whether blood analysis identification evidence

[2] *People v Davis,* 343 Mich 348, 370; 72 NW2d 269 (1955), and *Frye v United States,* 54 US App DC 46, 47; 293 F 1013, 1014 (1923).

from the technique of serological electrophoresis is competent evidence. A *Davis-Frye* hearing should have been held. We remand this case to the trial court for an evidentiary hearing to determine whether the results of serological electrophoresis have achieved general scientific acceptance for reliability among impartial and disinterested experts. We retain jurisdiction." 418 Mich 24-25.

In the present appeal, the prosecution claims that the record shows that the results of the serological electrophoresis testing has achieved general scientific acceptance for reliability to be admissible under the *Davis-Frye* standard.

The *Davis-Frye* rule requires that expert testimony deduced from a well-recognized scientific principle or discovery must be preceded by a proper foundation showing that the principle or discovery is sufficiently established to have gained general acceptance in the particular field in which it belongs. This foundation must be established by an impartial and disinterested expert. *Young, supra,* 418 Mich 21, fn 7.

In this case, the prosecution failed to lay a proper foundation for the evidence through impartial and disinterested experts *before* the evidence was introduced. On the contrary, the expert used to introduce this evidence was Curtis Fluker, a state police laboratory serologist.

Nevertheless, we need not reverse. In *Young,* the Court left open the question whether a violation of the *Davis-Frye* rule's foundational prerequisite will, per se, require reversal. It remanded the case for an evidentiary hearing to permit the proper laying of a foundation as to whether or not the procedure was reliable enough to have been admitted. 418 Mich 24-25.

In the present case, after Fluker testified about his interpretations of the results, the prosecution

introduced Professor Henry Gershowitz of Human Genetics at the University of Michigan, to testify that electrophoretic testing has been available since about the mid-1950's. He indicated that the technique has widespread use and application throughout the entire scientific community and he specifically testified that the test is "accurate in the sense that if a reasonably competent technician performs the test, there is no reason whatever to doubt the results of the test".

Likewise, before Fluker gave his testimony, the prosecution introduced Dr. Laurence Simson, a forensic pathologist, who testified that blood electrophoresis is a reliable technique in the medical and scientific community for various types of analyses.

Accordingly, on this record, we find that the initial error of not laying a proper foundation for the admission of this evidence was rendered harmless from the testimony of two other highly qualified, impartial and disinterested experts. Both experts indicated that serological electrophoresis has received general acceptance in the scientific community to be reliable enough for its admission at defendant's trial.

## VIII

Finally, defendant argues that it was a violation of the Legislature's intent and the Double Jeopardy Clause[3] to convict him of eight counts of felony-firearm where the eight offenses were committed during one continuous transaction.

The question whether multiple punishment should be imposed is answered by determining what the Legislature intended. *People v Robideau,* 419 Mich 458, 482; 355 NW2d 592 (1984). Under

---

[3] US Const Am V, XIV; Const 1963, art 1, § 15.

Michigan's felony-firearm statute, MCL 750.227b(1); MSA 28.424(2)(1), the Legislature provided that the carrying or possession of a firearm during the commission or attempt to commit a felony shall be punished separately from, and consecutive to, the predicate felony. *Wayne County Prosecutor v Recorder's Court Judge*, 406 Mich 374; 280 NW2d 793 (1979), *app dis sub nom Brintley v Michigan*, 444 US 948; 100 S Ct 418; 63 L Ed 2d 317 (1979). Accordingly, a conviction may be obtained for both the predicate felony and the possession of a firearm during the perpetration of that predicate felony. Here, on the other hand, the question is more troublesome: Can the possession of more than one firearm during the commission of more than one felony, albeit in the same criminal transaction, support a conviction for more than one violation of the provisions of the felony-firearm statute? Again we must turn to the intention of the Legislature to answer this question. *Robideau, supra; People v Wakeford*, 418 Mich 95; 341 NW2d 68 (1983).

In *Wakeford,* the Supreme Court dealt similarly with the question of multiple punishment in the context of a single criminal statute; namely, MCL 750.529; MSA 28.797 (armed robbery). The issue was whether the armed robbery of two grocery store cashiers constituted one or two robberies. After construing the armed robbery statute,[4] the Supreme Court emphasized that it was the assaultive character of the robbery that the Legislature had made criminal:

"The primary purpose of the statute is the protection

---

[4] The Court focused first on whether the language of the armed robbery statute established that the Legislature intended that two convictions might result under MCL 750.529; MSA 28.797. The Court concluded that the Legislature did intend such a result. *People v Wakeford,* 418 Mich 95, 111; 341 NW2d 68 (1983).

of persons * * *. The appropriate 'unit of prosecution' for larceny is the taking at a single time and place without regard to the number of items taken; the appropriate 'unit of prosecution' for armed robbery is the person assaulted and robbed." 418 Mich 111-112.

Thus, the Court, in *Wakeford,* rejected a claim that two convictions of armed robbery constituted double jeopardy. 418 Mich 114.

In the present case, we must determine whether the language utilized in the felony-firearm statute supports multiple punishment for the carrying or possession of more than one firearm at the time of commission or attempt to commit more than one felony during a single transaction and, if so, whether the evil sought to be proscribed by the Legislature is achieved when more than one conviction is obtained under the statute.[5]

MCL 750.227b(1); MSA 28.424(2)(1), provides in part:

"A person who carries or has in his possession a firearm at the time he commits or attempts to commit a felony * * * shall be imprisoned for 2 years."

In *Bell v United States,* 349 US 81; 75 S Ct 620; 99 L Ed 905 (1955), cited in *Wakeford, supra,* the United States Supreme Court faced a similar problem in construing the Mann Act.[6] The Court ac-

---

[5] The present question is better analyzed under *Wakeford, supra,* than *Robideau, supra,* because *Robideau* involved the question of multiple punishment in the context of more than one statute while this case, like *Wakeford,* concerns the question of multiple punishment when only one statute is involved. See *Robideau, supra,* p 484.

[6] When *Bell, supra,* was decided, the relevant provisions of the act were:

"Whoever knowingly transports in interstate or foreign commerce * * * any woman or girl for the purpose of prostitution or debauchery, or for any other immoral purpose * * *.

"Shall be fined not more than $5,000 or imprisoned not more than five years, or both." 18 USC 2421.

knowledged that "Congress could no doubt make the simultaneous transportation of more than one woman in violation of the Mann Act liable to cumulative punishment for each woman so transported", but ruled that "[Congress] has not done so in words in the provisions defining the crime and fixing its punishment". 349 US 82-83; 75 S Ct 622; 99 L Ed 910. The Court held that the act was too ambiguous and that "th[is] ambiguity should be resolved in favor of lenity". We find the same to be true with the felony-firearm statute. See and compare *People v Wilder,* 411 Mich 328, 365; 308 NW2d 112 (1981) (RYAN, J., concurring). Accordingly, we hold that the language of the felony-firearm statute is ambiguous and the rule of lenity must therefore be applied. We conclude that, where a defendant engages in a single criminal transaction, the felony-firearm statute supports only a single conviction regardless of the number of firearms carried or possessed by the defendant and regardless of the number of felonies committed or attempted by the defendant. *Cf. People v Adams,* 128 Mich App 25, 32-33; 339 NW2d 687 (1983).

Because we reach this result based upon an interpretation of the statute, we need not address what evil the Legislature sought to proscribe when it enacted the statute. We vacate seven of defendant's convictions for possession of a firearm during the commission of a felony.

Affirmed in part and reversed in part.