PEOPLE v FURMAN

Docket No. 84528. Submitted May 20, 1986, at Lansing. Decided
     March 3, 1987. Leave to appeal applied for.
   John P. Furman was found guilty but mentally ill of murder in
     the first degree, following a jury trial in Lenawee Circuit Court,
     John C. Timms, J. Defendant appealed by leave granted.
   The Court of Appeals *held:*
   1. The evidence of defendant's sexual interest in the victim,
coupled with the evidence that the defendant may have held
the victim for a period of time before strangling the victim to
death, provided a sufficient basis upon which the jury could find
the premeditation and deliberation necessary to sustain the
finding of murder in the first degree.
   2. Assuming that the question of the admission of certain
hearsay testimony relative to statements made by the victim
was properly preserved, and to the extent that certain of that
hearsay testimony should not have been admitted, it is clear
that the error in admitting that testimony was harmless.
   3. It was not an abuse of discretion for the trial court to deny
defendant's motion to bifurcate the trial so as to have separate
juries determine the questions of guilt and insanity.
   4. The trial court did not abuse its discretion in denying

REFERENCES
Am Jur 2d, Appeal and Error §§ 797 *et seq.;* 880 *et seq.*
Am Jur 2d, Criminal Law § 688.
Am Jur 2d, Evidence §§ 497, 650, 801.5 (Supp), 1104, 1147.
Am Jur 2d, Homicide §§ 425 *et seq.;* 439, 509.
Am Jur 2d, Jury §§ 195 *et seq.*
Exception to hearsay rule, under Rule 803(3) of Federal Rules of
     Evidence, with respect to statement of declarant's mental, emo-
     tional, or physical condition. 75 ALR Fed 170.
Admissibiliy of videotape film in evidence in criminal trial. 60
     ALR3d 333.
Pretrial publicity in criminal case as ground for change of venue.
     33 ALR3d 17.
Homicide: presumption of deliberation or premeditation from the
   . fact of killing. 86 ALR2d 656.
See also the annotations in the Index to Annotations under Appeal
     and Error; Blood Tests; Joint and Separate Trial; Voir Dire.

defendant's motion for a change of venue, since those members of the jury who had heard of the case indicated that they could set aside the prior knowledge and render an impartial verdict.

5. The record provides an adequate evidentiary basis to support the jury's finding that defendant was guilty of first-degree murder but was mentally ill at the time.

6. The trial court did not abuse its discretion in refusing to admit a videotaped interview of the defendant by the defense psychiatric expert, which was offered for the purpose of showing the basis for the defense expert's opinion, on the basis that it would allow the defendant the opportunity to testify without being under oath or subject to cross-examination.

7. The size of the class with which a defendant shares a common blood-type characteristic goes to the weight the jury may give to the evidence, not to the admissibility of the blood-type evidence.

8. Defendant failed to preserve with a proper objection below the question of the admissibility of the testimony concerning the results of the electrophoresis testing.

9. The trial court properly admitted expert testimony concerning fibers found on or near the victim's body even though the expert could not conclusively state that the fibers came from defendant's coat.

10. The wire coat hanger found in defendant's apartment which was similar to the wire used to strangle the victim was properly admitted into evidence.

Affirmed.

SHEPHERD, J., dissented from the majority on the issue of the trial court's refusal to admit the videotaped interview of the defendant by the defense psychiatric witness. He would hold that, if the trial court did not view the tape before making its ruling, that failure to view the tape constitutes a clear abuse of discretion on the part of the trial court. He would remand to the trial court for an evidentiary hearing to establish on the record whether the trial court viewed the tape before making its ruling and, if not, whether the failure to view the tape before making the ruling was harmless error.

1. CRIMINAL LAW — EVIDENCE — SUFFICIENCY OF EVIDENCE — APPEAL.

A court reviewing a claim that there was insufficient evidence to support a conviction will review the record to determine whether sufficient evidence was introduced to justify a trier of fact in reasonably concluding that the defendant is guilty beyond a reasonable doubt.

2. Homicide — Evidence — Premeditation — Deliberation.

Premeditation and deliberation need not be established by direct evidence, but may be inferred from all the facts and circumstances established on the record; the brutal nature of a killing does not alone justify an inference of premeditation and deliberation, however, manual strangulation coupled with evidence that the defendant secretly held the victim against her will for a period of time before killing her is sufficient to permit a jury to infer premeditation and deliberation.

3. Evidence — Hearsay — State-of-Mind Exception — Rules of Evidence.

Evidence of a declarant's state of mind is admissible under the state of mind exception to the hearsay rule only when the declarant's state of mind is an issue in the case (MRE 803[3]).

4. Homicide — Evidence — Intent of Victim — Rules of Evidence.

A homicide victim's declaration as to where he or she intended to go and with whom he or she was going is admissible to show subsequent conduct (MRE 803[3]).

5. Evidence — Hearsay — State-of-Mind Exception — Rules of Evidence.

The state-of-mind exception to the hearsay rule is limited to the declarant's then-existing mental, emotional or physical condition and expressly precludes a statement of memory (MRE 803[3]).

6. Criminal Law — Evidence — Harmless Error Rule — Appeal.

A two-tiered analysis is used to determine whether an error concerning the admission of evidence is harmless: whether the error was so offensive to the maintenance of a sound judicial process that it never can be regarded as harmless and whether the court can declare a belief that the error was harmless beyond a reasonable doubt; error is not harmless under the first test if it was deliberately injected into the proceedings by the prosecutor, if it deprived the defendant of a fundamental element of the adversary process, or if it was particularly inflammatory or persuasive; error is not harmless under the second test where it is reasonably possible that, in the absence of the error, a juror would have voted to acquit.

7. Trial — Bifurcation — Discretion.

The decision whether to bifurcate a trial for the purpose of letting a separate jury consider an insanity defense rests within the sound discretion of the trial court and will not be overturned on appeal absent a showing of an abuse of discretion.

8. CRIMINAL LAW — VENUE — PRETRIAL PUBLICITY — CHANGE OF
VENUE.

The existence of pretrial publicity does not in itself require a
change of venue; if jurors are able to set aside their impres-
sions or opinions and render a verdict based upon the evidence
adduced at trial, a change of venue is not necessary.

9. CRIMINAL LAW — VENUE — CHANGE OF VENUE.

A change of venue because of pretrial publicity is proper only
where there is a finding of a strong community feeling or a
bitter prejudice toward the defendant.

10. JURY — VOIR DIRE — TRIAL.

The purpose of voir dire of prospective jurors is to afford counsel
the opportunity to develop a rational basis for exercising both
challenges for cause and peremptory challenges, and the scope
of voir dire is entrusted to the discretion of the trial judge.

11. CRIMINAL LAW — EVIDENCE — VIDEOTAPES — INSANITY.

It is not an abuse of discretion for a trial court to refuse to admit
a videotaped interview of a criminal defendant by the defense
psychiatric expert in support of the expert's testimony as to
defendant's insanity defense on the basis that the tape would
be highly prejudicial in that it would allow the defendant to
testify without being under oath or subject to cross-examina-
tion.

12. EVIDENCE — BLOOD-TYPE EVIDENCE — PROBATIVE VALUE.

The size of the class of persons sharing the same blood type as
the defendant goes to the weight that the trier of fact may give
the evidence, not to the admissibility of the blood-type evidence.

*Frank J. Kelley,* Attorney General, *Louis J.
Caruso,* Solicitor General, *Nathan T. Fairchild,*
Prosecuting Attorney, and *Thomas C. Johnson,*
Assistant Attorney General, for the people.

State Appellate Defender (by *Peter Jon Van
Hoek*), for defendant on appeal.

Before: SHEPHERD, P.J., and ALLEN and G. R.
COOK,* JJ.

* Circuit judge, sitting on the Court of Appeals by assignment.

G. R. Cook, J. After a jury trial in Lenawee Circuit Court, defendant was found guilty but mentally ill of first-degree murder, MCL 750.316; MSA 28.548, for the killing of a college honors coed. Defendant was sentenced to imprisonment for his natural life without parole. He appeals from his conviction by leave granted to file a delayed appeal.

The prosecution's case against defendant was based upon circumstantial evidence presented through the testimony of more than forty witnesses, not including expert testimony from a rebuttal witness. Defendant testified and raised two defenses: a reasonable doubt existed that defendant was the perpetrator of the homicide; and, in the alternative, legal insanity. On appeal defendant raises eight issues. We affirm.

The victim's body was discovered in a field off of a country road outside of Tecumseh, Michigan, on Tuesday, January 31, 1984, at 7:30 A.M. She was last seen alive in Tecumseh at approximately 5:30 P.M., Monday, January 30, 1984. Just two weeks before her death, the victim assumed employment as an Avon lady and was assigned a route which covered the Russell Square Apartments in Tecumseh where defendant lived.

A description of the victim's actions on January 30 is warranted to more fully appreciate defendant's arguments on appeal and the factual setting of this case.

Ruth McCarley, a Tecumseh resident, testified that her daughters had ordered Avon products from the victim and that the victim had stopped at her house between 12:30 P.M. and 1:30 P.M. to make a delivery but then agreed to return about 5:00 P.M. when Ruth's daughters would be home. Ruth testified that the victim never returned. Several residents of Russell Square Apartments

testified that the victim had delivered their Avon orders to them at home between 1:30 P.M. and 3:00 P.M. on Monday, January 30. Lillian Gardner, a family friend, testified that she saw and waved to the victim at a gas station around 4:20 P.M. or 4:25 P.M. Delores Letson, a friend of the victim from high school, testified that she talked to the victim at the Tecumseh Plaza at about 4:45 P.M. The victim invited the Letsons over for a visit and explained that she had to run into the store and had three Avon orders to drop off but would be home in one hour. Judy Aranda, another Avon customer who lived in Tecumseh, testified that the victim delivered her order and left at 5:15 P.M. Waltrud Sterling testified that the victim was alone in her car, signaling a turn, when she blew her horn and waved at Sterling at approximately 5:30 P.M.

I

Defendant argues that the prosecution presented insufficient evidence on the element of premeditation. According to defendant, the evidence was sufficient to sustain a second-degree murder conviction but was lacking in several key areas to establish a cold-blooded, deliberate and planned killing rather than one committed in the heat of passion or frenzy. These areas include: a prehomicide motive, defendant's actions preceding the offense to show a plan for the homicide, and a prior relationship between the victim and defendant other than that established by the sale of Avon products to defendant by the victim. He contends that the brutality of the method of killing alone is not evidence of a deliberate plan. Finally, he argues that the evidence of sexual relations tending to show that the homicide was committed in the

course of a criminal sexual assault is consistent with a finding that the killing was the result of the heat of passion and not cool-headed reflection.

When reviewing a claim of insufficient evidence, we review the record to determine whether sufficient evidence was introduced to justify a trier of fact in reasonably concluding that the defendant is guilty beyond a reasonable doubt. *People v Hampton,* 407 Mich 354, 368; 285 NW2d 284 (1979), cert den sub nom *Michigan v Hampton,* 449 US 885 (1980). To premeditate is to think about beforehand; to deliberate is to measure and evaluate the major facets of a choice or problem. *People v Vail,* 393 Mich 460, 468; 227 NW2d 535 (1975), quoting *People v Morrin,* 31 Mich App 301; 187 NW2d 434 (1971). Premeditation and deliberation characterize a thought process undisturbed by hot blood. *Vail, supra.* While the minimum length of time needed to exercise this process is incapable of exact determination, a sufficient interval between the initial thought and the ultimate action should be long enough to afford a reasonable man an opportunity to take a "second look" at his contemplated actions. *Vail, supra,* p 469. See, also, *People v Tilley,* 405 Mich 38, 45; 273 NW2d 471 (1979).

Premeditation and deliberation need not be established by direct evidence, but may be inferred from all the facts and circumstances established on the record. *People v Hoffmeister,* 394 Mich 155, 158-159; 229 NW2d 305 (1975), reh den 394 Mich 944 (1975); *People v Conklin,* 118 Mich App 90, 93; 324 NW2d 537 (1982). Evidence of the following nonexclusive factors may establish premeditation: (1) the previous relationship of the parties; (2) the defendant's actions prior to the actual killing; (3) the circumstances of the killing itself; and (4) the defendant's conduct after the homicide. *People v Johnson,* 93 Mich App 667; 287 NW2d 311 (1979).

For other nonexclusive factors, see *People v Conklin, supra.*

The brutal nature of a killing does not alone justify an inference of premeditation and deliberation. *People v Hoffmeister, supra,* p 159. It has been held that evidence of manual strangulation and a defendant's posthomicide conduct support a prima facie case of first-degree premeditated murder. *People v Irby,* 129 Mich App 306, 323; 342 NW2d 303 (1983), lv den 418 Mich 951 (1984). See, also, *People v Charles,* 58 Mich App 371, 384; 227 NW2d 348 (1975), lv den 397 Mich 815 (1976) (evidence of strangulation by the use of an electrical cord and evidence of a struggle at the scene of the crime constitute sufficient evidence of premeditation and deliberation for the jury).

After reviewing the entire record, we conclude that sufficient evidence was presented from which the jury could infer premeditation. Evidence was presented from which the jury could infer motive and a deliberate plan by defendant's prehomicide actions. Compare, *People v Gilbert,* 101 Mich App 459, 469; 300 NW2d 604 (1980).

Evidence of motive, a sexual interest in the victim, was presented through the testimony of Todd Davis Sparks. On August 15, 1984, Sparks, an escapee from Jackson Prison, was lodged in the Lenawee County Jail in a cell adjacent to that of defendant. According to Sparks, he and defendant conversed after defendant learned that Sparks had escaped from prison. Defendant wanted to know what prison conditions were like. Defendant explained that he was incarcerated for killing the Avon lady. Defendant described her as so "good-looking, that he wanted some." Defendant told Sparks that he had made a pass at the Avon lady when she delivered a gift which defendant had purchased for his ex-wife on their divorce. Defen-

dant told Sparks that the Avon lady became "radical." Defendant told Sparks that he had a seizure and remembered taking her out to the van. Sparks testified that defendant remembered he dumped her on some "line" road. Sparks testified that defendant revealed no details of the killing or the length of the seizure.

As an explanation for why he was caught, defendant told Sparks that he was on the client list. He further told Sparks that police had found one of her earrings and stated: "I fucked up. She lost an earring." Sparks testified that he had no plea agreement for the escape charge when he reported this conversation to police. He further testified that he knew nothing about the case until his conversation with defendant.

Evidence of defendant's prehomicide actions was presented which could support an inference of premeditation or an opportunity to give his actions a second look.

Katherine Richter, formerly defendant's second wife, testified that she visited defendant in his apartment twice on January 30, the date their divorce became final. She first visited him in the afternoon, arriving at 3:23 P.M. and leaving by 3:55 P.M. She delivered the final divorce papers and had defendant sign off of their joint bank account. According to her testimony, defendant told her that he had a gift to give her as a memento of the marriage but that he had not yet received it. She further testified that they had sexual relations at his request. She testified that defendant threw the gift, an Avon necklace, at her when she visited him the second time, shortly after midnight.

Janet Ann Poley, an acquaintance from the Seventh Day Adventist Church, testified that defendant's apartment was dark between 6:15 P.M. and 6:20 P.M. when she stopped to pick him up for

the weekly Monday evening revelation seminar at church. She and her husband had befriended defendant during his divorce and regularly picked him up for the seminars three nights each week and for the Sabbath service. As had been the habit for the previous two months, Poley checked for defendant's appearance in the window of his second-floor apartment where he usually would wave before coming out to the car. When she saw that the apartment was dark, she went inside and twice knocked loudly on his apartment door. She testified that she did not feel comfortable knocking on the door because she felt that defendant was inside the apartment in the dark. She promptly left.

Joey Lee Underwood, a neighbor living directly below defendant's apartment, testified that he had considered visiting defendant after dinner on January 30. He decided not to go when he heard a woman's voice coming from the apartment at approximately 7:00 P.M. or 7:30 P.M. He was unable to distinguish any words but testified that the woman's voice was spoken in a conversational tone. Underwood testified that he did not hear screams or yelling and heard no voices after 11:00 P.M.

Evidence of the circumstances of the killing provided additional evidence to support an inference of a deliberate killing. A bronze wire ligature, resembling a coat hanger, was found twisted around the victim's neck. The victim's hands were bound behind her back and she was blindfolded. Although the victim was clothed, her sweater had been cut open and her underclothes were in disarray.

Dr. Laurence Simson performed an autopsy on the victim and testified that the cause of death was strangulation. There were no other major injuries to the body. Dr. Simson noted that the

victim's wrists had been tightly bound by adhesive
tape and fibercord over the tape, obstructing the
blood flow to the victim's hands. The medical
examiner was unable to determine the time of
death. He testified that the wire ligature was
twisted many times. He could not determine how
long it had taken to twist the ligature to cause
death.

From the evidence of defendant's prehomicide
actions and the victim's whereabouts, the jury
could infer that the victim arrived at defendant's
apartment after 5:30 P.M. to deliver the necklace,
that defendant intentionally darkened the apart-
ment and refused to respond to Poley's knocks,
and that defendant continued to hold the victim
against her will as late as 7:00 P.M. or 7:30 P.M.
This evidence, together with the other evidence of
the killing, provides enough evidence from which
the jury could infer premeditation.

II

Defendant contends that the trial court erred by
admitting, over defense objections, several state-
ments attributed to the victim. Defendant claims
that reversal is required under *People v White*,
401 Mich 482; 257 NW2d 912 (1977).

Richard Barker, the victim's fiancé, testified that
the victim had talked to him about one male
customer. Defense counsel objected on grounds of
hearsay and the Dead Man's Statute. The prosecu-
tion argued that MRE 803 allowed the admission
of evidence of "state of mind of the decedent or of
a declarant." The trial court allowed the prose-
cutor to continue this line of questioning. Defense
counsel raised no other objection thereafter, but
asserts on appeal that it was assumed further
objection would fail.

Defendant challenges the following testimony of
Barker elicited on direct examination. Barker tes-
tified that the victim had discussed only one male
customer, that she thought he was strange because
all he would do is talk, and that he wanted her to
pick out a gift for his ex-wife. Barker testified that
she and the customer had picked out a necklace.
According to Barker, the victim stated that the
customer lived at Russell Square Apartments.

We note that defendant does not challenge the
testimony of Barker elicited by defense counsel on
cross-examination which delved further into the
conversation between the victim and Barker. Ac-
cording to Barker, the conversation occurred dur-
ing the first week that the victim had her Avon
route. The victim identified the male customer by
name in their conversation, but Barker was unable
to remember it at trial. According to Barker, the
victim stated that she got a strange, uneasy feel-
ing about being there. In another conversation on
Saturday, January 28, the victim told Barker that
she was concerned about delivering the order to
this customer on Monday, because all the things
he had ordered had not arrived.

Defendant challenges the testimony of the vic-
tim's mother and the girlfriend of the victim's
brother concerning similar conversations in which
the victim had expressed nervousness about a
male customer at the Russell Square Apartments.
According to the girlfriend, the victim related an
incident that occurred on a second visit to the
customer at the Russell Square Apartments. The
victim was knocking on the door across the hall
when the customer opened his door and invited
her in. When she asked the customer and his two
male friends if they wished to order any Avon
products, they laughed and asked: "Do you de-
liver?" The victim said she was frightened and did

not know how to take this until she was told the friends were from Toledo. The victim said she was promised a big order.

Defendant also challenges the testimony of Kimberly Ann Will, a resident of Russell Square Apartments. Her testimony related a conversation she had with the victim between 1:30 P.M. and 2:00 P.M. on January 30, when the victim delivered an Avon order. The conversation concerned a divorced man who lived in the apartment buildings. The man was not identified by name. The victim stated that he was weird and that she dreaded going back to his apartment because he had kept her there for over an hour on each of her previous two visits. According to Will, the victim stated that the man would just go on talking even though she announced her intentions to leave, and that he would flip through the book and continue talking.

Assuming that defendant raised a sufficiently specific and timely objection to this evidence, we believe that this case is distinguishable from *People v White, supra,* on several grounds. In that case, error mandating reversal was found on three grounds, including the erroneous admission of rebuttal evidence. The rebuttal evidence constituted statements made by the decedent two weeks before his death. According to the rebuttal witness, the decedent stated that he and the defendant had had an argument and that he was frightened of the defendant. The trial court had earlier sustained an objection to this evidence, precluding its use in the prosecution's case in chief. No limiting instruction was given or requested. The defendant was charged and convicted by jury of first-degree murder.

In *White, supra,* pp 502-507, admission of the conversation was deemed prejudicial error because the decedent's state of mind was not an important

issue (i.e., it was not related to an element of the charged offense or of any asserted defense). Further, the likelihood of unfair prejudice from this testimony outweighed its probative value.

In contrast, in this case defendant's name was never given in any of the conversations except the first one between the victim and Barker. More importantly, defendant's name was not identified in the testimony at trial. Further, no specific argument, conflict or assaultive behavior by defendant was shown through this testimony. The likelihood of unfair prejudice to this defendant is not as great as that which accrued to the defendant in *White, supra,* where the defendant was expressly identified by name. Although the evidence of the victim's conversations may not have helped defendant, it did not specifically single him out as the unidentified male customer. In short, the prejudice to defendant does not rise to the level of error mandating reversal as it did in *White.*

Interestingly enough, defendant has chosen not to challenge the evidence elicited from Barker on cross-examination of the victim's intent to deliver an incomplete order to the male customer on January 30.

A common use of a victim's declarations of state of mind or emotion is to prove state of mind when state of mind is an issue in the case. See *White, supra,* pp 502-504. The hearsay exception provided by MRE 803(3) allows the admission of such declarations when state of mind itself is an issue. *People v Lucas,* 138 Mich App 212, 220-221; 360 NW2d 162 (1984), lv den 421 Mich 854 (1985).

Although the victim's state of mind was not directly at issue (as in a case where self-defense is asserted), her declarations, specifically, her intent to deliver an incomplete order to a male customer, could be admitted under MRE 803(3) to show

subsequent conduct. It has long been held in Michigan that a homicide victim's declarations of where she intended to go and with whom are admissible. *People v Atwood,* 188 Mich 36, 51; 154 NW 112 (1915) (the decedent's statements that she intended to go for a walk with the defendant was admissible as a "verbal act," but it was for the jury to decide whether the statements truthfully explained her conduct and purpose). *People v Knight,* 122 Mich App 584, 595; 333 NW2d 94 (1983).

The leading case on this point is *Mutual Life Ins Co of New York v Hillmon,* 145 US 285; 12 S Ct 909; 36 L Ed 706 (1892), in which the exclusion of evidence of the victim's present intent which could show subsequent conduct was held to be error requiring reversal. The *Hillmon* rule was expressly left undisturbed by the hearsay exception established by FRE 803(3). Federal Advisory Committee Note, FRE 803(3). See, McCormick On Evidence, § 295, pp 847-848. For further discussion, see 6 Wigmore On Evidence, §§ 1725-1726, pp 129-142. MRE 803(3) is identical with Rule 803(3) of the Federal Rules of Evidence. See staff note to MRE 803.

In the case sub judice, evidence of the victim's intent was probative to show her conduct on January 30 because defendant asserted a defense that the proofs did not establish beyond a resonable doubt that he was the perpetrator. Even if defendant had raised a timely and specific objection, the trial court could have allowed the evidence to show the victim's conduct on January 30.

Having determined that reversal is not mandated by *White, supra,* we consider whether admission of the challenged evidence was otherwise erroneous. The testimony challenged on appeal may be categorized this way: (1) evidence of the

number, frequency, length and nature of the victim's past visits to the male customer; and (2) evidence of the victim's feelings toward her customer (i.e., nervousness, dread, fear).

The victim's declarations of the number, frequency, length and nature of her past visits to the male customer were not admissible under MRE 803(3). These statements did not express her state of mind at the time the conversations were held, but instead constituted statements of memory based upon past events. Compare *People v DeRushia*, 109 Mich App 419, 424-425; 311 NW2d 374 (1981).

Likewise, the victim's statements of emotion (i.e., fear, dread, nervousness) were not admissible under MRE 803(3). They either constituted a statement of memory (i.e., how the victim felt on past occasions) or they constituted statements of her then-existing state of mind, which was not at issue. Thus, assuming that defendant raised an adequate objection and preserved the issue for review, we find that the trial court erred by allowing the testimony.

Our next inquiry is whether the error was harmless or mandated reversal. *People v Stubl*, 149 Mich App 42, 46; 385 NW2d 719 (1986), lv den 425 Mich 864 (1986). The harmless error test considers: (1) whether the error is so offensive to the maintenance of a sound judicial system that it never can be regarded as harmless; and (2) whether the error was harmless beyond a reasonable doubt so that not even one juror would have voted to acquit the defendant but for the error. *People v Robinson*, 386 Mich 551, 563; 194 NW2d 709 (1972); *Stubl, supra.* The purpose of the first criterion is to deter prosecutorial and police misconduct, whereas the purpose of the second criterion is to safeguard the decisional process. *People*

*v Wright (On Remand),* 99 Mich App 801, 811; 298
NW2d 857 (1980).

An error may be intolerably offensive to the
maintenance of a sound judicial system if it was
deliberately injected into the proceedings by the
prosecution, if it deprived the defendant of a fun-
damental element of the adversary process or if it
is of a particularly inflammatory or persuasive
kind. *People v Gallon,* 121 Mich App 183, 188-189;
328 NW2d 615 (1982).

Defendant does not claim that the error was
deliberately injected by the prosecution or that it
amounts to prosecutorial misconduct. Defendant
was not deprived of a fundamental element of the
adversary process concerning the evidence of the
victim's previous visits, because this evidence was
shown by competent testimony. *Stubl, supra,* p 46.
See, also, *People v Kregger,* 335 Mich 457, 472; 56
NW2d 349 (1953). On cross-examination defendant
admitted that he saw the victim three times and
described each of her visits.

Defendant denied that the victim had ever acted
afraid of him. Thus the evidence of the victim's
feelings toward an unnamed male customer was
not shown by other competent evidence. However,
under the circumstances presented in this case, we
conclude that admission of this hearsay evidence
was not such an affront to the integrity of the trial
process that reversal is warranted. *People v Swan,*
56 Mich App 22; 223 NW2d 346 (1974), lv den 395
Mich 810 (1975).

Our next consideration is whether the error in
admitting the hearsay evidence was harmless be-
yond a reasonable doubt. As the Court stated in
*People v Swan, supra,* p 33:

The purpose of this requirement is to safeguard

the defendant's right to be convicted only by a jury and only upon their finding of his guilt beyond a reasonable doubt. In applying this standard, therefore, we may not substitute our independent judgment of the defendant's guilt or innocence for the judgment of the jury. Instead, we must assess only "what effect the error had or reasonably may be taken to have had upon the jury's decision." We must determine "whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction," that is, whether it might have aided in convincing an otherwise undecided juror of the defendant's guilt beyond a reasonable doubt. If it is reasonably possible that, in a trial free of the error complained of, even one such jury member might have voted to acquit the defendant, then the error was not harmless, and the defendant must be retried. If, on the other hand, "the proof was so overwhelming, aside from the taint of the error, that all reasonable jurors would find guilt beyond a reasonable doubt," then the conviction must stand.

Although this inquiry presents a closer issue, after reviewing the evidence presented to the jury, we find no reasonable possibility that the hearsay evidence contributed to defendant's conviction. Compare, *People v Soles,* 143 Mich App 433, 440; 372 NW2d 588 (1985), lv den 424 Mich 863 (1985). The evidence of defendant's guilt, although circumstantial, was ample. The absence of the hearsay evidence would not possibly have led a juror to vote for defendant's acquittal. Indeed, we believe that the proofs against defendant were so convincing, aside from the taint of error, that all reasonable jurors would have found guilt beyond a reasonable doubt. The error in admitting the hearsay evidence does not require reversal of defendant's conviction.

III

Defendant argues that the trial court abused its discretion when it denied his pretrial motion to bifurcate the trial on the issues of guilt and legal sanity. According to defendant, the demands of due process and a fair trial should have resulted in a favorable ruling since both of the defense theories, namely, a reasonable doubt and legal insanity, were substantial. He argues that the prejudicial impact of requiring defendant to proceed on both defense theories before one jury requires reversal.

The decision to grant or to deny a bifurcated trial rests within the sound discretion of the trial court. *People v Donaldson,* 65 Mich App 588, 590; 237 NW2d 570 (1975). We review the decision of the trial court under an abuse of discretion standard. *People v Meatte,* 98 Mich App 74, 80; 296 NW2d 190 (1980). An abuse of discretion involves a result which is so palpably and grossly violative of fact and logic that it evidences not the exercise of will but perversity of will, not the exercise of judgment but defiance thereof, not the exercise of reason but rather of passion or bias. *People v Charles O Williams,* 386 Mich 565, 573; 194 NW2d 337 (1972), quoting *Spalding v Spalding,* 355 Mich 382, 384-385; 94 NW2d 810 (1959), but observing a stricter standard.

The trial court denied the motion for the reason that defendant would not suffer undue prejudice by presenting the defense of insanity before the same jury which would determine his guilt or innocence. The trial court made its ruling without regard to whether or not it actually had authority to grant the motion. We find no abuse of discretion.

The argument alleging prejudice was aptly re-

futed by this Court in *Meatte, supra,* p 79. The
*Meatte* Court noted that the prejudice which
arises in the presentation of inconsistent defenses
before one jury does not stem from the single jury
procedure. Instead, it stems from the defendant's
choice to present a second version of the facts
which is less credible. It noted that, if more than
one defense is credible, neither defense is likely to
be hurt by the assertion of the other.

The trial court did not abuse its discretion by its
ruling, and defendant was not deprived of his right
to a fair trial.

IV

Defendant argues that error mandating reversal
occurred when the trial court denied his pretrial
motions for a change of venue and for individual-
ized voir dire or, in the alternative, voir dire
conducted on the basis of a list of ninety questions
proposed by defendant. Pretrial publicity of this
case consisted of newspaper articles and radio
news reports which described the murder investi-
gation and the pretrial proceedings. According to
defendant, the pretrial publicity was so extensive
that it was impossible for him to receive a fair and
impartial trial in Lenawee County and, further,
that the extensive publicity required the trial
court to probe the extent of each juror's knowledge
of the case.

The existence of pretrial publicity alone does not
necessitate a change of venue. *People v Prast (On
Rehearing),* 114 Mich App 469, 477; 319 NW2d 627
(1982). A change of venue is not necessary if jurors
can set aside their impressions or opinions and
render a verdict based upon the evidence pre-
sented in court. *Prast, supra.* A change of venue
may be granted if the defendant demonstrates that

there is a pattern of strong community feeling or bitter prejudice against him and the publicity is so extensive and inflammatory that jurors could not remain impartial when exposed to it. *Prast, supra.*

MCR 2.511(C), formerly GCR 1963, 511.3, provides that the trial court may conduct the voir dire examination of prospective jurors. The purpose of voir dire is to give counsel the opportunity to develop a rational basis for exercising both challenges for cause and peremptory challenges. *People v Vesnaugh,* 128 Mich App 440, 444; 340 NW2d 651 (1983), lv den 418 Mich 966 (1984). The scope of voir dire is entrusted to the discretion of the trial judge and will not be set aside absent an abuse of discretion. *People v Harrell,* 398 Mich 384, 388; 247 NW2d 829 (1976).

We reject both of defendant's arguments in light of the record presented in this case. Although there had been pretrial publicity surrounding this case, the jurors who felt they could not render an impartial decision were excluded for cause. Seven of the twelve jurors who decided this case indicated that they had prior knowledge of the case, yet each one stated that he or she could set aside his or her prior knowledge and impartially decide the case upon the evidence presented. No pattern of strong community feeling or bitter prejudice against defendant was shown.

The trial court did not abuse its discretion by its denial of the change of venue motion. *People v Jancar,* 140 Mich App 222, 229; 363 NW2d 455 (1985). No error arose in the voir dire of the jury.

V

Defendant argues that he was denied his constitutional right to due process of law when the jury found him guilty but mentally ill of first-degree

murder in light of the facts of this case which allegedly show that the verdict was an unfair and invalid compromise.

Defendant acknowledges that the Michigan Supreme Court has held that the special verdict of guilty but mentally ill, MCL 768.36; MSA 28.1059, is constitutional and does not deny due process of law under US Const, Am XIV; Const 1963, art 1, § 17. *People v Ramsey,* 422 Mich 500; 375 NW2d 297 (1985), reh den 424 Mich 1201 (1985). Defendant asserts that the dissenting opinion in *Ramsey, supra,* represents the correct view.

MCL 768.36(1); MSA 28.1059(1) allows a trier of fact to return a guilty but mentally ill verdict under the following circumstances:

> If the defendant asserts a defense of insanity in compliance with section 20a [MCL 768.20a; MSA 28.1059(1)], the defendant may be found "guilty but mentally ill" if, after trial, the trier of fact finds all of the following beyond a reasonable doubt:
>
> (a) That the defendant is guilty of an offense.
>
> (b) That the defendant was mentally ill at the time of the commission of that offense.
>
> (c) That the defendant was not legally insane at the time of the commission of that offense.

Legal insanity is defined by MCL 768.21a; MSA 28.1044(1):

> A person is legally insane if, as a result of mental illness as defined in section 400a of Act No. 258 of the Public Acts of 1974, being section 330.1400a of the Michigan Compiled Laws, or as a result of mental retardation as defined in section 500(g) of Act No. 258 of the Public Acts of 1974, being section 330.1500 of the Michigan Compiled Laws, that person lacks substantial capacity either

to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law.

Mental illness is defined in MCL 330.1400a; MSA 14.800(400a):

As used in this chapter, "mental illness" means a substantial disorder of thought or mood which significantly impairs judgment, behavior, capacity to recognize reality, or ability to cope with the ordinary demands of life.

Defendant offered the expert testimony of a forensic psychiatrist in support of his legal insanity defense. The expert diagnosed defendant as a chronically mentally ill person, suffering from one or more psychiatric conditions. They are paranoid schizophrenia, organic brain impairment which manifests itself in psychomotor seizures, and posttraumatic stress disorder. The expert testified that, if defendant committed the homicide, he did it as the result of mental illness and was legally insane (i.e., without an ability to conform his behavior to the requirements of law). The expert testified that several factors aggravated his mental illness, including the impending divorce and his anger because the victim did not deliver all that he had ordered. The expert opined that the evidence surrounding the killing was so contrary to defendant's background, history and personality that, if defendant did commit the homicide, he must have been in a dissociative state.

In rebuttal, the prosecution offered the testimony of an expert witness who was qualified as a forensic examiner and board eligible in forensic psychiatry. The expert distinguished mental illness (a legal term defined by statute and not a psychiatric term) from mental disorder (a term used by the American Psychiatric Association di-

agnosis manual) when he explained his diagnosis of defendant. The expert explained that a person could have a personality disorder without being mentally ill. He further explained that an individual could be mentally ill and still not be legally insane. When formulating his diagnosis of defendant, the expert considered police reports and statements by witnesses, defendant's previous hospital, medical and psychiatric records, and his own observations and test results obtained during two interviews with defendant.

The prosecution expert opined that defendant suffered a posttraumatic stress disorder and a mixed personality disorder. In his view, defendant was not mentally ill on January 30, 1984, because no objective evidence was presented to indicate mental illness. He attributed the lack of objective evidence to defendant's lack of memory of the events on that day. He opined that defendant was not mentally ill during the two interviews, and that previous discharge summaries indicated that defendant was not mentally ill. He concluded that defendant was not legally insane because he was not mentally ill on January 30, 1984. On cross-examination, the expert acknowledged that there are times when a borderline personality disorder is extremely disorganized such that it impairs one's ability to cope with the ordinary demands of life.

In light of the record evidence presented, the jury could have concluded that defendant was mentally ill but not legally insane on January 30, 1984. The jury could accept the testimony of defendant's expert that the posttraumatic stress syndrome impaired defendant's ability to cope with the ordinary demands of life. The jury could also have accepted the testimony of the prosecution expert witness that defendant did not lack a capacity to appreciate the wrongfulness of his conduct.

Such a finding would be consistent with the prosecution expert's testimony that an individual may be mentally ill but not necessarily legally insane.

In any event, the record shows that the trial court polled the jury when the verdict was delivered and there was no indication of a compromise verdict. MCR 2.512(B)(2), formerly GCR 1963, 512.2. We find no violation of defendant's right to due process of law.

VI

During trial defendant moved to admit a videotaped interview of defendant by the defense psychiatric expert. Defendant argued that the videotape provided the best evidence of the foundation on which the expert based his opinion. The trial court denied the motion, ruling that the tape would be highly prejudicial since it would allow the defendant to testify without being under oath and subject to cross-examination, notwithstanding defense counsel's promise that defendant would testify and would be subject to cross-examination. The trial court recognized that the jury could be instructed to disregard defendant's statements for their truth and to use them only as the basis of the expert's opinion; however, the trial court concluded that such a cautionary instruction would be ineffective.

The admission of evidence rests within the sound discretion of the trial court, and the decision to admit or to exclude evidence will not be overturned absent a clear abuse of discretion. *People v Strickland,* 78 Mich App 40, 54; 259 NW2d 232 (1977), lv den 402 Mich 917 (1978). Since the defense expert was able to testify about the factual and professional bases of his opinion, the probative value of the videotape was significantly dimin-

ished. We further note that the record does not
clearly show whether or not the trial court viewed
the videotape before ruling, but that would not
affect the ability of the defense expert to testify
about the bases of his expert opinion. We find no
abuse of discretion.

VII

Defendant raises several evidentiary challenges
to the admission of expert testimony with respect
to blood typing and fiber analyses performed dur-
ing the investigation of this case. On appeal two
challenges are made to the admission of testimony
concerning blood typing, and one challenge is ad-
dressed to the fiber analyses.

During trial defendant moved to exclude any
expert testimony related to the fact that defen-
dant's blood type was the same as the blood type
determined from an analysis of semen found in
the victim's body. Defendant argued that the re-
sults of the test placed defendant in a group that
was too large in size to be probative of the ques-
tion of whether he had been the source of the
semen. Defendant further argued that the testi-
mony would be more prejudicial than probative.
After hearing argument on the motion, the trial
court denied the motion, finding that the evidence
would be relevant and that the class was small
enough to allow the jury the opportunity to con-
sider the evidence.

Carolyn Bazzett, a State Police Crime Lab serol-
ogist, described the blood type of defendant, the
victim and her fiancé. She testified that the vic-
tim's fiancé was a nonsecretor which meant that
she would not be able to detect his blood type from
any of his body fluids. She testified that the victim
was a Group o secretor and that defendant was a

Group A secretor. Electrophoresis testing of semen deposited in the victim revealed that the donor was a Group A secretor. Additional electrophoresis testing yielded results which showed that the victim's fiancé could not have been the donor of the semen. She testified that the donor could have come from approximately twelve percent of the population, which group included defendant. She testified that these testing methods were generally accepted.

On appeal defendant reiterates his argument that the expert testimony on blood typing could only place defendant within a large class of individuals who could have been the source of semen and thus error mandating reversal arose when his motion was denied. We are not persuaded that the trial court abused its discretion by admitting this evidence. The size of the class with which a defendant shares a common characteristic goes to the weight that the trier of fact may give the evidence, and does not go to its admissibility. *People v Goree,* 132 Mich App 693, 700-704; 349 NW2d 220 (1984). We find no error.

Defendant's second challenge to the results of the electrophoresis testing is one which was not raised below in defendant's motion or by way of objection. Defendant argues that the foundation for this evidence did not clearly establish that electrophoresis testing has met the standards of general scientific acceptance.

According to defendant, resolution of this issue depends upon the ultimate decision of our Supreme Court in *People v Young,* 418 Mich 1; 340 NW2d 805 (1983). In post-*Young* cases, panels of this Court have held that evidence of the results of electrophoresis blood testing may be admitted where the prosecution has met its burden of establishing general scientific acceptance of the testing

by disinterested expert witnesses. *People v Bunting,* 145 Mich App 210, 212-213; 377 NW2d 307 (1985) (the issue of the admissibility of electrophoresis evidence has not been temporarily frozen pending the final outcome of *Young, supra,* and may be decided when a proper foundation has been established); *People v Haggart,* 142 Mich App 330, 342-345; 370 NW2d 345 (1985), lv den 426 Mich 876 (1986) (the absence of a per se rule in *Young, supra,* requiring reversal with respect to a violation of the foundation requirements required by the *Davis-Frye*[1] standard allows the panel to affirm the admission of the electrophoresis evidence presented on the record).

In *People v Young (After Remand),* 425 Mich 470; 391 NW2d 270 (1986), the majority determined that the prosecution failed to sustain its burden of proving general scientific acceptance of the reliability of serological electrophoresis of evidentiary dried bloodstains among impartial and disinterested experts in the scientific community. The majority concluded that the admission of the results of the blood analyses was not harmless error. The majority used language which appears to limit the holding to the facts of that case. 425 Mich 475, 480-490. Also, see the dissenting opinion filed by Justice BOYLE, 425 Mich 505, n 1. In contrast, the electrophoresis testing challenged here was performed on semen found in the victim's body. This method of electrophoresis testing was not considered by the Court in *Young (After Remand), supra.* See the dissenting opinion of BOYLE, J., 425 Mich 505.

Error may not be predicated upon a ruling which admits evidence unless a substantial right of the party is affected and a timely objection,

---

[1] *People v Davis,* 343 Mich 348; 72 NW2d 269 (1955); *Frye v United States,* 54 US App DC 46; 293 F 1013 (1923).

stating the specific ground of objection, has been made. MRE 103(a). Where an objection is not raised below, it is waived on appeal. *People v Browning,* 106 Mich App 516, 525; 308 NW2d 264 (1981), lv den 419 Mich 852 (1984). Since no challenge to the foundation of the electrophoresis evidence was raised below, we consider it waived.

Finally, defendant challenges the trial court's decision to admit expert testimony concerning fibers found on and near the victim's body which could have come from defendant's coat. According to defendant, the evidence was more prejudicial than probative since the expert witness could not conclusively state that the fibers were from defendant's coat and could not estimate how many other coats or materials could have been the source of the fibers. Although we find no case directly on point to guide us, we conclude that the trial court did not abuse its discretion by admitting the evidence. The expert's inability to conclusively associate the fibers with defendant's coat goes to the weight, and not the admissibility, of this evidence.

VIII

Defendant challenges the trial court's decision to admit a broken coat hanger found by police in their second search of defendant's apartment. According to defendant, the trial court erred because no foundation was made to tie the coat hanger to the offense. The bronze-colored wire coat hanger with the hook broken off was admitted into evidence as plaintiff's Exhibit 81.

At the beginning of trial, two witnesses described the ligature found on the victim as a coat hanger. The ligature, plaintiff's Exhibit 33, was identified and presented to the jury through the

testimony of the forensic examiner. The prosecution argued that it offered plaintiff's Exhibit 81 to show its similarity to the ligature found on the victim's body.

The rule governing the admission of physical evidence requires that a proper foundation be laid and that the articles be identified as that which they purport to be and that the articles are shown to be connected with the crime or with the accused. *People v Hence,* 110 Mich App 154, 161; 312 NW2d 191 (1981). In this case the prosecution presented evidence connecting the coat hanger with defendant. The fact that defendant possessed a coat hanger similar to the ligature found with the victim was relevant on the issue of the assailant's identity. Thus, its probative value outweighed its prejudicial effect. MRE 403. The trial court did not abuse its discretion by admitting the coat hanger into evidence. *Hence, supra,* p 162.

Affirmed.

ALLEN, J., concurred.

SHEPHERD, J. *(dissenting).* I agree with the opinion of the majority in its entirety with the exception of one issue which, in my view, requires a remand to the trial court for an evidentiary hearing.

During trial, defendant moved to admit a videotape interview of defendant with the defense psychiatric expert. The expert's opinion was substantially based upon this psychiatric interview. Defendant argued that the videotape provided the best evidence of the foundation upon which the expert based his opinion. The trial court ruled that the videotape was inadmissible. The court stated that the videotape would be highly prejudicial since admission would permit defendant to testify with-

out being under oath and subject to cross-examination. The court recognized that it could instruct the jury to consider defendant's statements during the interview not for their truth, but only as evidence of the basis of the expert's opinion. The court concluded, however, that such a cautionary instruction would be ineffective. Moreover, since the expert would be able to testify as to the basis of his opinion, the court concluded that the probative value of the videotape was greatly diminished.

The admissibility of evidence is a matter which rests within the sound discretion of the trial court, and this Court will not overturn the trial court's decision to admit or exclude evidence absent a clear abuse of discretion. *People v Strickland,* 78 Mich App 40, 54; 259 NW2d 232 (1977), lv den 402 Mich 917 (1978). The record, however, is unclear as to whether the trial court viewed the videotape prior to ruling it inadmissible. If the court did not view the videotape first, it failed to exercise any discretion. Failure to exercise discretion constitutes error. *People v Hayes,* 410 Mich 422, 425; 301 NW2d 828 (1981).

In *People v McDaniel,* 99 Mich App 582; 297 NW2d 724 (1980), the defendant argued that the trial court abused its discretion in permitting the jury to view a videotape of the defendant selling an automobile to undercover agents. In the videotape, defendant mentioned other criminal transactions in which he might have been involved. The trial court admitted the tape without viewing it. The defendant argued that the trial court could not properly determine whether the videotape's contents were more probative than prejudicial. This Court affirmed without addressing that issue. Judge T. M. BURNS dissented, however, stating in part: "I fail to see how a judge can properly exercise his discretion in this matter without view-

ing the evidence sought to be admitted. Judge
BURNS noted that the *McDaniel* Court did not view
the videotape in making its ruling. 99 Mich App
586. The same is true in the instant case.

Other jurisdictions have faced this issue with
differing results. In *Eaton v State,* 394 A2d 217,
219 (Del, 1978), the trial court refused to permit
the defendant to play for the jury a tape recording
of his psychiatric interview, which took place
while he was under the influence of sodium amy-
tal. The defendant sought introduction of the tape
to help explain why the psychiatrist had formed a
different opinion after the examination. Without
listening to the tape, the trial court excluded it
because of possible prejudice and confusion. The
appellate. court found no abuse of discretion, as the
trial court was adequately informed of the nature
of the proffered evidence and the gist of its con-
tents, including "unrestricted testimony" by the
psychiatrist "about the tape and the significance of
an aural exposure to it." The appellate court also
noted the defendant had not identified what more
understanding about the offer of evidence the trial
court would have had after listening to the entire
tape.[1]

---

[1] Other courts have found no abuse of discretion in cases where the
trial court failed to listen to the objected-to tape before playing it to
the jury, similar to the situation in *People v McDaniel,* 99 Mich App
582; 297 NW2d 724 (1980). See *United States v Bryant,* 480 F2d 785,
789 (CA 2, 1973) (while correct procedure would have been for judge
to listen to tape to rule on objections before jury heard it, failure to
follow this procedure does not require reversal); *Kerr v State,* 256 Ark
738; 512 SW2d 13 (1974), cert den sub nom *Pinnell v Arkansas,* 419
US 1110 (1975) (defendant had ample time to acquaint himself with
contents of the tape and object thereto); *State v Williams,* 235 Kan
485; 681 P2d 660 (1984) (trial judge need not listen to a 911 tape
recording of the actual rape in progress where there was sufficient
adequate testimony that the recording was accurate); *State v Burd-
gess,* 434 So 2d 1062 (La, 1983) (while better course would have been
prescreening of videotape by judge with editing to delete duplicative
material, failure to do so did not require reversal given significant
quantity of physical evidence linked to defendant as well as his

On the other hand, in *Pratt v State,* 39 Md App 442, 451; 387 A2d 779 (1978), aff'd 284 Md 516 (1979), the defendant sought to admit a videotape of an interview with one of the defense psychiatrists. The videotape was made without the defendant's knowledge, so that the psychiatrist could verify his impressions concerning defendant's veracity and to confirm certain of his own observations. The trial judge did not view the tape, but merely stated he felt it would not be necessary or helpful. The videotape was not included as part of the record on appeal. The appellate court stated, 39 Md App 451:

> While the absence of the tape from the record precludes us from specifically passing on its admissibility, we do not see how the trial judge could have properly exercised his discretion in deciding the evidence would not be necessary or helpful without viewing the tape.[10]

---

[10] We do not mean to say that the trial judge must review all such evidence before ruling on its admissibility. However, where a proper foundation has been laid and the evidence would otherwise be relevant, a viewing of the tape would be necessary to a proper exercise of discretion unless the evidence is being rejected on the grounds that it is cumulative or it is apparent that the tape is objectionable for some other reason.

---

This states the better view.[2]

---

confession; *Bey v State,* 36 Md App 529; 373 A2d 1291 (1977) (the court was reluctant to require a judge in every case to listen to tape outside jury's presence; a trial court need not listen if counsel have had opportunity to hear tape or read a transcript and object).

[2] As a general proposition the court in *United States v Lemonakis,* 158 US App DC 162; 485 F2d 941 (1973), cert den 415 US 989 (1974), noted that a trial judge should customarily hear a recording out of the jury's presence to rule on objections to admissibility. Accord, *Wright v State,* 38 Ala App 64; 79 So 2d 66 (1954), cert den 262 Ala 420 (1955). In *Larimer v State,* 163 Ind App 673; 326 NE2d 277 (1975), it was held error to play a tape of a confession to the jury without the trial court first reviewing the tape and taking steps to delete inappropriate material, despite later instructions for the jury to disregard

The evidence on the insanity issue was not overwhelming in the instant case, unlike the evidence showing that defendant actually killed the decedent. Evidence was presented by defendant's expert concerning several traumatic experiences defendant had in Viet Nam, including one where a Vietnamese prostitute attacked defendant and he strangled her. Defendant was also ordered to administer medication to Viet Cong prisoners to keep them coherent while being tortured. Against this backdrop, the basis for the expert's testimony as disclosed by the videotape interview could have been very useful to the jury in deciding the insanity question.

At the present state of these proceedings, the remedy is not a new trial. Without more information, it is impossible to determine if the trial court's exclusion of the videotape was in error. It is entirely possible that the videotape should have been excluded. At this stage, it is only clear that the manner in which the trial court made its determination was wrong.

Accordingly, this case ought to be remanded for a hearing. The trial court and counsel should view the videotape, together or separately, and counsel should prepare arguments on whether the videotape should have been admitted. The trial court should make findings and balance the advantages and disadvantages of admitting the videotape on the record. The transcript of this hearing would then be filed with this Court and the parties would file supplemental briefs. Jurisdiction should be retained. We would then know whether failure to admit the tape was error and, if so, whether it was

certain statements on the tape. In *State v Jarvis*, 56 NC App 678; 290 SE2d 228 (1982), the court approved the trial court's listening to a tape, made by the victim while the defendant was forcing her to have sexual intercourse with him, before ruling on its admissibility.

harmless. In my view this is the only way to determine whether the jury had a fair opportunity to evaluate the insanity defense—the only real issue in the case and an issue which by any view of the facts was extremely close.