*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
October 20, 2025
8:44 AM

Plaintiff-Appellee,

v

No. 369350
Wayne Circuit Court
LC No. 23-000610-01-FC

JAQUONE QUORTEZE LEACH,

Defendant-Appellant.

Before: LETICA, P.J., and RICK and BAZZI, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial convictions of second-degree murder, MCL 750.317; assault with intent to commit murder (AWIM), MCL 750.83; first-degree home invasion, MCL 750.110a(2); and three counts of possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b(1). Defendant was sentenced to 35 to 60 years' imprisonment for the second-degree murder conviction, 20 to 40 years' imprisonment for the AWIM conviction, 10 to 20 years' imprisonment for the first-degree home invasion conviction, and two years' imprisonment for each of his felony-firearm convictions. The sentences for felony-firearm were ordered to be served concurrent with each other, but consecutive to defendant's other sentences. We affirm.

## I. FACTUAL BACKGROUND

This case arises from the death of the victim, Eric Marcus Coleman, on January 26, 2020. Coleman's cousin, Ronnell Wilson, testified that he and Coleman were returning to Wilson's house on Prairie Street in Detroit when they were attacked by a group of men in black ski masks. It was approximately 10:00 p.m. at the time and Wilson had just walked into his kitchen when he saw "about two [men] behind [Coleman]" from the backyard of the house. Wilson testified at trial that there were more than just two men attempting to attack Coleman, but he "couldn't see the rest of them because they was [sic] coming from my back yard." Coleman attempted to fight off his attackers, but was overwhelmed. Wilson testified that the men told Coleman, "Don't move[,]" and that one of them stated, "Just shoot the m*********r."

-1-

Wilson stated that when he saw Coleman was in trouble, he ran up a flight of stairs, yelling for his roommate, Curtis Lee, to call the police. One of the masked men entered the house and chased Wilson up the stairs. When Wilson and his attacker were about halfway up the staircase, he heard gunshots ring out and froze in place. Wilson testified that he then turned around and grabbed a gun that was on the ground between him and his attacker. Wilson believed the man must have dropped the gun, because the attacker turned around and ran back down the stairs. Wilson then broke the glass out of an upstairs window and fired at the attackers. The men fled down an alleyway near the house and Wilson heard a car driving away. Wilson went downstairs and saw that Coleman had been shot and killed. He dragged Coleman's body into the house and locked the door before calling the police.

Officer Brandon Ely responded to a call for backup at the scene. He stated that when he arrived, a man wearing "all black clothing or dark-colored clothing, gloves, and a ski mask" was "hung up on the fence" in the backyard behind the house. Officer Ely observed that the man had been shot. The man, who was later identified as Pierre Perkins, was taken to Sinai-Grace Hospital for treatment. Officer Ely and a partner left the Prairie Street address and went to Sinai-Grace Hospital. While they were on the way, they received some information that another gunshot victim had also arrived at the hospital. The second gunshot victim was identified as defendant.

As part of the investigation, Officer Ely reviewed hospital surveillance footage and determined that defendant had been dropped off at the hospital in what he believed was a tan or gold Chevrolet Equinox. When he ran the license plate number, it indicated that it matched a Ford Taurus, suggesting that the license plate was stolen. While he was at the hospital, he detained Perkins as a possible suspect in the shooting.

Carrington Sheridan, a Detroit Police forensic technician, testified that he and a partner processed the scene at the Prairie Street house. He testified that he observed fired shell casings and a fired bullet in the driveway and more shell casings in the backyard. Also discovered in the backyard were "additional fired shell casings, a live round, and an extended ammunition magazine, a firearm, suspected blood, and . . . an alley with another firearm." Sheridan testified that further down the alley, investigators found a single Nike tennis shoe.

Detroit Police Sergeant Jeb Rutledge testified that he was instructed to go to Sinai-Grace hospital in response to the shooting. Sergeant Rutledge arrived at the hospital at around 1:00 a.m. He testified that he spoke with hospital security and determined that defendant had been dropped off at the hospital in a silver Chevrolet Equinox. Andrew Moore, a security officer at the hospital, testified at trial that a silver Chevrolet Equinox pulled up to the emergency department entrance on the night in question. Three men were in the car, and one of them told Moore that their friend had been shot. Two of the men pulled the third man—later identified as defendant—out of the backseat and placed him on the ground. Moore testified that he took down the car's license plate information, and that while he was standing near the car, he noticed what appeared to be ski masks and a semiautomatic firearm in the backseat of the car.

Sergeant Rutledge asked hospital security if they had any property belonging to defendant. Security stated that they had taken some clothing off of defendant when he arrived at the hospital. Sergeant Rutledge asked for the clothing, and a security guard took the items out of a locked room and handed them over. The items were contained in a blue plastic bag and included a Nike tennis

shoe, a face mask, and identification cards belonging to defendant. Sergeant Rutledge seized the clothing and took it to Detroit Police headquarters. Sergeant Rutledge testified that, when he brought the bag of clothing back to headquarters, he was unsure whether defendant had yet been arrested in relation to the shooting.

Defendant was initially charged with first-degree murder, MCL 750.316(1)(a); felony murder, MCL 750.316(1)(b); AWIM, MCL 750.83; two counts of armed robbery, MCL 750.529; six counts of felony-firearm, MCL 750.227b(1); and first-degree home invasion, MCL 750.110a(2). At defendant's preliminary examination, the prosecutor indicated that he would only proceed with six of the twelve charges. Defendant was thus charged with first-degree murder, MCL 750.316(1)(a); AWIM, MCL 750.83; first-degree home invasion, MCL 750.110a(2); and three counts of felony-firearm, MCL 750.227b(1).

Before trial, defendant filed a motion to suppress the evidence, quash the information, and dismiss the case. Four days later, he filed an amended motion, raising the same claims and requesting the same relief. Defendant argued that the police violated his right against unlawful searches and seizures by seizing the bag of his clothing at the hospital prior to his arrest. Defendant reasoned that the illegally obtained evidence "served as the primary element the prosecution offered to establish identification of [defendant] as a perpetrator of the crime's charges [sic]" and that without it, the prosecution would not have been able to establish probable cause. Defendant also reasoned that the "inevitable discovery" rule did not justify the seizure and that the police could and should have obtained a warrant for his clothing. Defendant further argued that his arrest was illegal and not based on probable cause.

At a hearing on the motion, Sergeant Rutledge testified that he spoke with Perkins and defendant in the hospital. Defendant said that he had been shot in the vicinity of Prairie Street. After speaking to defendant, Sergeant Rutledge obtained the bag of defendant's clothing from security. Notably, Sergeant Rutledge initially testified that security gave the property to him, but proceeded to testify that he is unsure who gave him the property. Sergeant Rutledge believed he had the legal right to take the property because, at the time, he believe that defendant was the victim of a crime. He later testified on cross-examination that he believed the property to be abandoned. He explained that, based on more than 24 years of law enforcement experience, hospitals in Detroit often destroyed bloody and contaminated clothing. However, he admitted that he did not receive any information that the clothing was going to be destroyed from hospital personnel on the date of the incident.

Sergeant Todd Eby testified that he was with Sergeant Rutledge at the hospital on the night defendant was brought in for treatment. While he was at the hospital, Sergeant Eby received information from detectives who were processing the evidence at the Prairie Street house, indicating that Perkins was a suspect and that defendant may also be a suspect, as he was somehow connected to Perkins. Sergeant Eby testified that Sergeant Rutledge went back to the Detroit Police headquarters, where he determined, based on law enforcement databases, that there was an associational connection between Perkins and defendant. Sergeant Eby then advised officers to place defendant under arrest. Sergeant Eby testified that when defendant's property was taken, he had not yet been placed under arrest. He additionally stated that he was not with Sergeant Rutledge when Rutledge took possession of the property.

On cross-examination, Sergeant Eby testified that he had more than 13 years of experience executing search warrants for firearms, blood, and clothes. Sergeant Eby also testified that the security guard had indicated that the clothing, which was saturated in blood, would be destroyed if defendant died in the hospital. He explained that in even in nonfatal shootings, the victim's property is often so saturated with blood that it becomes a biohazard risk, meaning the hospital would dispose of it. Sergeant Eby further stated that, in his experience, it was common in hospital settings for officers to search and seize property without obtaining a search warrant.

The trial court ultimately denied defendant's motion. The trial court reasoned that either "exigent circumstances or inevitable discovery" justified the warrantless seizure of defendant's clothing. The court continued:

> [W]hile there was some testimony from both officers saying that they know the hospital's policy is when there are bloody clothes it's a biohazard, that those clothes are disposed of by the hospital and they're not necessarily given back, but their policy is to dispose of a biohazard with the rest of the blood and other things that they dispose of at the hospital, and that they knew that these things would be destroyed by the hospital and disposed of.
>
> So there could be an argument for exigent circumstances in that they don't know necessarily when the hospital is going to dispose of these things.
>
> But they are certainly biohazards. They were told that they were bloody clothes that are usually deemed a biohazard from their experience on the job, and both of them had quite a few years of experience on the job.

However, the court ultimately found the inevitable discovery rule to be the more compelling justification for the seizure, stating:

> Sgt. Eby testified that he, based on all the information he was getting from the scene; from the statements taken from the person that survived, Mr. Wilson; based on reviewing the video at the hospital; talking to Security Guard Moore, who told him that the defendant had a mask on him when he came in, and then showed him the mask—but he was told by Officer Moore that the defendant had a mask in his property, and that there was a gun in the back seat of the car where the defendant got out of when he was brought to the hospital. They came to get him on the gurney, and he saw the gun in the back seat where the defendant came out of.
>
> All of these things have to be taken into account. And the fact that the 911 call came in at 11:32 or 11:30 something, and about 15 minutes later the defendant's dropped off at the hospital, the closest hospital to the scene of the shooting, and, you know, he's a black male with a mask.
>
> And mind you, this is before COVID. This is in January of 2020. This is not when everybody's being seen with masks after March, April of 2020 . . . . So this is not a usual circumstance to see someone, you know, walking down the street or showing up at the hospital with a black mask in January of 2020.

And so, you know, that—all of these things tied in together led Sgt. Eby to reach a probable cause decision in placing the defendant under arrest.

And then once he's placed under arrest, all of his possessions have to be inventoried, and he is now in the custody of the Detroit Police Department. And his clothing would have been inventoried and taken into custody by the police department anyway upon his arrest.

The trial court thereafter entered three separate orders denying defendant's motion to suppress, motion to quash, and motion to dismiss.

Defendant's trial began on November 13, 2023. At trial, Michigan State Police Sergeant Dean Molnar was qualified as an expert in firearms and tool marks analysis. Sergeant Molnar received and tested four semiautomatic firearms, 11 spent cartridge cases, and one fired bullet in relation to the shooting. He testified that the fired bullet had been removed from Coleman's head during his autopsy. He explained that the bullet was classified as a .38/9-millimeter, meaning that "the English classification for the .38 caliber bullet, the metric is .9 mm." Sergeant Molnar determined that the bullet could not have been fired by two of the four guns related to the shooting—a Smith & Wesson handgun, or a Glock handgun. He further determined that his testing returned "inconclusive" results as to whether the bullet could have been fired by either of the two remaining handguns—a Springfield Armory handgun, or a Ruger handgun.

Jennifer Jones, a Michigan State Police forensic scientist, was qualified as an expert in forensic biology and DNA analysis. She testified that she received samples from various items found at the scene of the crime for DNA testing. Her tests concluded that it was "4.3 septillion times more likely" that DNA found on the Smith & Wesson handgun originated from defendant. Defendant's DNA was not found on any of the other items tested, including the Ruger and Springfield Armory handguns, several ski masks, and a debit card.

The prosecution rested following Jones's testimony. Defendant elected not to testify. Defense counsel then moved for a directed verdict, arguing that insufficient evidence had been presented to tie defendant to the case. The trial court denied the motion on the record.

Defendant then called Dr. Theodore Kessis to the stand. Dr. Kessis was qualified as an expert in Forensic DNA analysis, PCR analysis, and PCR analysis of short tandem repeats.[1] Dr. Kessis testified that the DNA analysis of the items taken from the crime scene was accurate and reliable. The defense rested following Dr. Kessis's testimony.

The following day, the jury deliberated and found defendant guilty of second-degree murder, MCL 750.317; AWIM, MCL 750.83; first-degree home invasion, MCL 750.110a(2); and

_____

[1] PCR stands for "polymerase chain reaction," and PCR analysis is a molecular biology technique used to amplify specific DNA sequences, making many copies of a DNA segment from a small initial sample. MedlinePlus, *PCR Tests* <https://medlineplus.gov/lab-tests/pcr-tests> (accessed August 21, 2025). Dr. Kessis explained that "STR analysis" involves testing DNA for unique, repeated DNA sequences.

three counts felony-firearm, MCL 750.227b(1). In December 2023, defendant was sentenced as earlier described. This appeal followed.

## II. ANALYSIS

### A. WARRANTLESS SEARCH AND SEIZURE

Defendant argues that the trial court erred by denying his motion to suppress the evidence, quash the information, and dismiss the case. He maintains that the police violated his Fourth Amendment right to be free of illegal searches and seizures by taking the bag of his clothing from the hospital without a warrant. He further contends that none of the exceptions to the warrant requirement apply, including the inevitable discovery rule. We agree that the search and seizure in this matter was not justified by an exception to the warrant requirement, but find that the error was ultimately harmless.

This Court reviews de novo a trial court's ruling on a motion to suppress evidence. *People v Mazzie*, 326 Mich App 279, 288-289; 926 NW2d 359 (2018) (quotation marks and citations omitted). This Court likewise reviews de novo whether a Fourth Amendment violation occurred, as well as whether an exclusionary rule applies to the matter at hand. *People v Mahdi*, 317 Mich App 446, 457; 894 NW2d 732 (2016) (quotation marks and citation omitted). The trial court's factual findings are reviewed for clear error. *Mazzie*, 326 Mich App at 288. "A finding of fact is clearly erroneous if, after a review of the entire record, an appellate court is left with a definite and firm conviction that a mistake has been made." *Mahdi*, 317 Mich App at 457.

The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized. [US Const, Am IV.]

Analogously, the Michigan Constitution provides that "[t]he person, houses, papers and possessions of every person shall be secure from unreasonable searches and seizures." Const 1963, art 1, section 11. Generally, "a search for purposes of the Fourth Amendment occurs when the government intrudes on an individual's reasonable, or justifiable, expectation of privacy." *People v Antwine*, 293 Mich App 192, 195; 809 NW2d 439 (2011) (quotation marks and citation omitted). "Searches or seizures conducted without a warrant are per se unreasonable, subject to several well-delineated exceptions." *People v Moorman*, 331 Mich App 481, 485; 952 NW2d 597 (2020). Accordingly, for a search to comply with the Fourth Amendment, "the police must show either that they had a warrant or that their conduct fell within one of the narrow, specific exceptions to the warrant requirement." *Id.* (quotation marks and citation omitted). The exceptions to the warrant requirement include "exigent circumstance[s], searches incident to a lawful arrest, stop and frisk, consent, and plain view." *People v Chowdhury*, 285 Mich App 509, 516; 775 NW2d 845 (2009) (quotation marks and citation omitted). Relevant to this appeal is a separate exception: the "inevitable discovery" rule, which states that "evidence should not be suppressed [i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or

inevitably would have been discovered by lawful means[.]" *People v Hyde*, 285 Mich App 428, 439; 775 NW2d 833 (2009) (quotation marks and citation omitted; alteration in original). If none of these exceptions apply, the contested evidence "must be excluded from trial." *Chowdhury*, 285 Mich App at 516 (quotation marks and citation omitted).

"When a defendant moves to suppress evidence as having been illegally obtained, it is the prosecutor's burden to show that the search and seizure were justified by a recognized exception to the warrant requirement." *People v Jordan*, 187 Mich App 582, 589; 468 NW2d 294 (1991). In *Jordan*, the defendant attempted to rob the victim at gunpoint, but the victim gained the upper hand and shot the defendant first. *Id*. at 584. The defendant was taken to the hospital by an accomplice and was in surgery when police arrived. *Id*. An officer requested the defendant's clothing, and hospital staff turned it over. *Id*. The officer opened the bag to look at the defendant's clothing. *Id*. He admitted that he did not have a search warrant at the time. *Id*. at 584-585. Before trial, the defendant moved to suppress the clothing as the product of an illegal search and seizure, but the trial court denied the motion. *Id*.

On appeal, this Court concluded that the trial court clearly erred in denying the motion to suppress. *Id*. at 592. This Court stated that the warrantless seizure of the clothing did not fall into any of the exceptions to the warrant requirement. *Id*. at 590. This Court further explained:

> [W]e find no evidence that defendant intended to abandon his clothing and therefore conclude that the hospital possessed the clothing as a bailee. Thus, the hospital personnel enjoyed joint access to and control over the clothing, but their duty was to safeguard the clothing, and they were required to exercise ordinary and reasonable care in performing that duty. The hospital personnel did not enjoy mutual use of the clothing; had they had mutual use, they would have been entitled to consent to the seizure without a warrant. Furthermore, the facts do not suggest that the clothing might have been lost or destroyed before a warrant could have been obtained by the police. The defendant was in surgery when the seizure occurred and remained hospitalized for several weeks thereafter. [*Id*. at 592.]

However, this Court ultimately concluded that the admission of the clothing into evidence was harmless error. *Id*. at 593. This Court reasoned that, based on the overwhelming evidence of the defendant's guilt, including the victim's identification of defendant, the outcome of the case likely would not have changed had the evidence been suppressed. *Id*. at 593-594.

As was the case in *Jordan*, Sergeant Rutledge's decision to seize defendant's clothing without his consent and without a search warrant in this matter violated defendant's Fourth Amendment rights. The issue then becomes whether an exception to the warrant requirement justified the search. *Id*. at 590. Here, the trial court considered exigent circumstances and the inevitable discovery rule as potentially applicable exceptions to the warrant requirement. Regarding exigent circumstances, this Court has explained:

> The exigent-circumstance exception is applicable where the police have probable cause to believe that an immediate search will produce specific evidence of a crime and that an immediate search without a warrant is necessary in order to

(1) protect the officers or others, (2) prevent the loss or destruction of evidence, or (3) prevent the escape of an accused. [*Id*. at 587.]

The trial court considered the second category, in which a warrantless search and seizure is required to "prevent the loss or destruction of evidence." *Id*. Sergeant Rutledge testified at trial that he did not have a warrant for the bag of clothing, but believed that if he did not obtain it, there was a chance that potential evidence could be "gone forever." He likewise testified at the hearing on defendant's motion to quash, suppress, and dismiss that he did not have a warrant or defendant's permission to seize the bag of clothing, but believed it was in imminent danger of being destroyed because hospitals typically destroy bloody clothing. He agreed, however, that hospital staff did not tell him that the bag of clothing was scheduled to be destroyed. On this record, there is no evidence that the bag of clothing would have been destroyed before the police could have obtained a search warrant. The exigent circumstances exception to the warrant requirement therefore does not apply.

The trial court's rationale for denying the motion to suppress, quash, and dismiss also focused on the inevitable discovery rule. The inevitable discovery rule was adopted by the United States Supreme Court in *Nix v Williams*, 467 US 431; 104 S Ct 2501; 81 L Ed 2d 377 (1984). There, the *Nix* Court explained that extending the exclusionary rule to cover evidence illegally obtained by police was necessary "to deter police from violations of constitutional and statutory protections notwithstanding the high social cost of letting obviously guilty persons go unpunished." *Id*. at 432. The *Nix* Court thus reasoned that, "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means . . . then the deterrence rationale has so little basis that the evidence should be received." *Id*.

Three concerns arise when considering the inevitable discovery rule: "(1) whether the legal means are truly independent, (2) whether both the use of the legal means and the discovery by that means are truly inevitable, (3) and whether the application of the inevitable discovery doctrine provides an incentive for police misconduct or significantly weakens Fourth Amendment protections." *Hyde*, 285 Mich App at 440. The key point, according to this Court's ruling in *Hyde*, is whether the police were in the process of obtaining a warrant when the seizure occurred. *Id*. at 445. This Court reasoned that evidence should be excluded if the police made no effort to obtain a search warrant before the seizure occurred, even though probable cause existed to obtain a warrant and the evidence could have been seized under a warrant. *Id*. As this Court explained:

> If evidence were admitted notwithstanding the officers' unexcused failure to obtain a warrant, simply because probable cause existed, then there would never be any reason for officers to seek a warrant. To apply the inevitable discovery doctrine whenever the police could have obtained a warrant but chose not to would in effect eliminate the warrant requirement. [*Id*. at 444 (citation omitted).]

Thus, the inevitable discovery rule cannot be applied if no evidence exists to show that the police were attempting to lawfully seize a defendant's property by obtaining a search warrant, *and* had the necessary probable cause to do so. *Id*. at 444-445.

Here, even if Sergeant Rutledge had probable cause to obtain a warrant for the bag of clothing, the record does not indicate that he was in the process of obtaining a warrant when he seized the bag and the items inside. See *Mahdi*, 317 Mich App at 470 (finding that the inevitable discovery rule did not apply to a warrantless search and seizure where the police were not in the process of obtaining a warrant when the seizure occurred). Additionally, the seizure in this instance runs afoul of the third prong of the inevitable discovery analysis. Applying the doctrine here would almost certainly "provide[] an incentive for police misconduct or significantly weaken[] Fourth Amendment protections," *Hyde*, 285 Mich App at 440, by allowing police to seize property without a warrant in any instance where probable cause can be established. As this Court reasoned in *Hyde*, "[t]o allow a warrantless search merely because probable cause exists would allow the inevitable discovery doctrine to act as a warrant exception that engulfs the warrant requirement." *Id*. at 445. Accordingly, the inevitable discovery rule does not apply to the warrantless seizure of the bag of clothing. The evidence therefore should have been excluded at trial.

However, under *Jordan*, we must still consider whether the admission of the evidence at trial constituted harmless error. *Jordan*, 187 Mich App at 593. "A constitutional error is harmless if [it is] clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *Hyde*, 285 Mich App at 447 (quotation marks and citation omitted; alteration in original). In *Jordan*, this Court explained:

> A two-tiered analysis is used in determining whether an error concerning the erroneous admission of evidence is harmless. First, it must be determined whether the error is so offensive to the maintenance of a sound judicial system that it can never be regarded as harmless and, second, whether the error was harmless beyond a reasonable doubt so that not even one juror, or, in the event of a bench trial, the judge, would have voted to acquit the defendant but for the error. *People v Robinson*, 386 Mich 551, 563; 194 NW2d 709 (1972). The first criterion is intended to deter prosecutorial and police misconduct, while the second is intended to safeguard the decisional process. *People v Furman*, 158 Mich App 302, 317; 404 NW2d 246 (1987). An error may be intolerably offensive to the maintenance of a sound judicial system if it was deliberately injected into the proceedings by the prosecution, if it deprived the defendant of a fundamental element of the adversarial process, or if it is of a particularly inflammatory or persuasive kind. *Id*., at [] 318; 404 NW2d 246. [*Jordan*, 187 Mich App at 593.]

Based on the aggregate evidence that defendant was present on Prairie Street during the shooting and participated in the killing of Coleman, defendant would not have been acquitted had the evidence at issue been suppressed. Evidence was presented that defendant arrived at the hospital in either a gold or silver Chevrolet Equinox that was later connected to the crime, in close temporal proximity to Perkins, who also arrived at the hospital on the same night after suffering a gunshot wound. Moore, the hospital security guard, testified that two men pulled defendant out of the Equinox, and that one of them said defendant had been shot. Moore further testified that he saw a handgun in the backseat of the Equinox and a ski mask on another seat inside the Equinox. He also asserted that defendant had a ski mask on his person when he was brought into the hospital. Defendant's DNA was also found on a Smith & Wesson handgun that was discovered at the scene of the crime. Here, as was the case in *Jordan*, "it cannot be said that the error was deliberately

injected into the trial by the prosecutor, but rather occurred as a result of the court's pretrial ruling that the evidence was admissible." *Jordan*, 187 Mich App at 594. Further, there is no evidence that the error in this matter was knowing or purposeful. *Id*. at 593-594. Accordingly, the trial court's error in admitting the evidence at issue was harmless beyond a reasonable doubt. Reversal is therefore not required.

## B. DEFENDANT'S STANDARD 4 BRIEF[2]

### 1. *BRADY* VIOLATION

Defendant argues that the prosecution's failure to call Curtis Lee as a witness at trial violated *Brady v Maryland*, 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963), because it prevented the defense from cross-examining Lee. Defendant claims that Lee had information regarding an anonymous letter containing evidence that defendant was a victim of the shooting on Prairie Street. We disagree.

Defendant failed to preserve this issue by moving in the trial court for a new trial or for relief from judgment on *Brady* grounds. *People v Burger*, 331 Mich App 504, 516; 953 NW2d 424 (2020). Unpreserved issues are reviewed for plain error affecting substantial rights. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). "To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *Id*. "The third requirement generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *Id*.

" '[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.' " *People v Chenault*, 495 Mich 142, 149; 845 NW2d 731 (2014), quoting *Brady*, 373 US at 87. To establish a *Brady* violation, defendant must show that "(1) the prosecution has suppressed evidence; (2) that is favorable to the accused; and (3) that is material." *Chenault*, 495 Mich at 149 (quotation marks omitted).

Defendant claims that the prosecution suppressed Lee's testimony regarding the contents of an anonymous letter. Lee was named in the prosecution's proposed witness list, but was never called to testify. He was therefore never cross-examined by the defense. Defendant does not claim that the prosecution prevented him from speaking with Lee, nor does he substantiate the argument that the failure to call a res gestae witness constituted a *Brady* violation in this instance. Generally,

---

[2] Defendant's Standard 4 brief does not contain a statement of the issues presented as required by the Michigan Court Rules. See MCR 7.212(C)(5). This failure could constitute abandonment of the issues. See *People v Brown*, 239 Mich App 735, 748; 610 NW2d 234 (2000). However, parties who represent themselves are generally entitled to more lenity in construing their pleadings than lawyers. See *Estelle v Gamble*, 429 US 97, 106-108; 97 S Ct 285; 50 L Ed 2d 251 (1976). We will address defendant's arguments accordingly.

*Brady* does not obligate the government to locate res gestae witnesses; rather, it only encompasses the government's duty to disclose exculpatory information in its possession. See *People v Gadomski*, 232 Mich App 24, 36; 592 NW2d 75 (1998) (stating that, under MCL 767.40a, the prosecution must "provide notice of known witnesses and reasonable assistance to locate witnesses on a defendant's request"). Additionally, the anonymous letter that defendant claims was suppressed was not produced at any point during the proceedings below. There is no mention of the letter in the record. The only mention of it is in the Standard 4 brief. Ultimately, defendant cannot establish a *Brady* violation based on the failure to call Lee at trial, because the failure to call a res gestae witness does not itself constitute a suppression of evidence. See *Chenault*, 495 Mich at 149 (stating that for a *Brady* claim to succeed, the defendant must prove that the prosecution suppressed evidence). Further, without evidence that the prosecution possessed the letter in the first instance, defendant cannot establish that the prosecution suppressed said evidence. See *id*. Defendant's *Brady* claim lacks merit.

## 2. DOUBLE JEOPARDY

Defendant next argues that he was deprived of his double jeopardy protections when the trial court dismissed the charges against him and refiled them the same day. He additionally contends that the refiling of the charges against him violated the doctrines of collateral estoppel and res judicata. This argument misconstrues the record.

"To preserve appellate review of a double jeopardy violation, a defendant must object at the trial court level." *People v Ackah-Essien*, 311 Mich App 13, 30; 874 NW2d 172 (2015). Defendant did not object to the reinstatement of the charges against him on double jeopardy grounds, via collateral estoppel or res judicata. Thus, the issue is unpreserved, and our review is for plain error affecting defendant's substantial rights. *Carines*, 460 Mich at 763.

"The Double Jeopardy Clauses of the United States Constitution and the Michigan Constitution prohibit a person from twice being placed in jeopardy for the same offense." *People v Barber*, 332 Mich App 707, 713; 958 NW2d 288 (2020). See also US Const, Am V; Const 1963, art 1, § 15. The prohibition against double jeopardy provides three protections: "(1) it protects against a second prosecution for the same offense after acquittal; (2) it protects against a second prosecution for the same offense after conviction; and (3) it protects against multiple punishments for the same offense." *Id*. (quotation marks and citation omitted). However, an accused is not placed in jeopardy the moment charges are filed. Instead, our Supreme Court has made it clear that "[a]n accused is placed in jeopardy as soon as a jury is selected and sworn." *People v Dawson*, 431 Mich 234, 251; 427 NW2d 886 (1988); see also *Ackah-Essien*, 311 Mich App at 32.

Here, defendant alleges that the trial court dismissed the charges against him on February 27, 2023, and refiled them the same day. This is not an accurate recitation of the facts. Defendant was arraigned on January 10, 2023 in the district court. A preliminary hearing was held on February 7, 2023, at which time the prosecutor moved for bindover on the offenses contained in Counts 1, 3, 6, 8, 11 and 12. It would appear from the record that the felony information initially filed in the circuit court was signed by the prosecutor on January 9, 2023. It erroneously contained charges of which defendant had not been bound over. Therefore, on March 3, 2023, the prosecution filed an amended felony information which reflected what transpired at the conclusion

of the preliminary examination. At the March 3, 2023 hearing, defense counsel acknowledged that the prosecution dismissed six of defendant's 12 charges.[3]

In any event, no jury was selected and sworn in this matter until the start of trial on November 13, 2023. Double jeopardy could not have attached in February 2023, when the felony information was amended. *Dawson*, 431 Mich at 251. Since the trial court did not infringe upon defendant's double jeopardy protections, defendant cannot establish that plain error occurred in this case. *Carines*, 460 Mich at 763. His argument thus lacks merit.

As noted, defendant also argues that refiling the charges against him violated the doctrines of collateral estoppel and res judicata. For the doctrine of collateral estoppel to apply to a criminal prosecution, there must be a prior litigation. *People v Brown*, 279 Mich App 116, 126; 755 NW2d 664 (2008). "Collateral estoppel bars relitigation of an issue in a subsequent, different litigation between the same parties where the prior proceeding culminated in a valid, final judgment and the issue was both actually litigated and necessarily determined." *Id.* Since there was no prior litigation, collateral estoppel is inapplicable here and defendant cannot establish otherwise. The prosecutor's office filed the amended information before trial. No final judgment had been entered at that point in the proceedings. Accordingly, the doctrine of collateral estoppel does not apply under the circumstances presented.

The doctrine of res judicata likewise does not apply here. Res judicata "bars a subsequent action when (1) the prior action was decided on the merits, (2) both actions involve the same parties or their privies, and (3) the matter in the second case was, or could have been resolved in the first." *Adair v State*, 470 Mich 105, 121; 680 NW2d 386 (2004). Here, defendant's argument fails on the first element. Trial had not started when the charges in this matter were dismissed and refiled. Consequently, no prior action had yet been "decided on the merits[.]" *Id.* Defendant is not entitled to relief on these grounds.

### 3. JUROR CONFUSION

Defendant also argues that testimony from Sergeant Molnar regarding a Glock handgun caused jury confusion. We conclude that the issue has been abandoned on appeal.

At trial, Sergeant Molnar testified that the Glock was included in ballistics testing with the firearms recovered in relation to this case. During his testimony, a juror submitted a question asking, "In your Conclusions, were there any casings or bullets that you concluded were from the Glock gun?" Sergeant Molnar responded that none of the casings or bullets matched the Glock

---

[3] This Court requested that defense counsel submit the transcripts from defendant's January 10, 2023 arraignment, and January 24, 2023 pre-exam hearing, in the hopes that doing so would provide a fuller picture of the timeline of events that defendant describes in his Standard 4 brief. On August 5, 2025, this Court received a stipulation from the parties indicating that they had agreed that supplying the Court with these transcripts was unnecessary to the determination of the issues. Upon close review of the record, charges were not filed, dismissed, and then refiled. Rather, an amended information was filed to reduce the number of offenses that defendant was charged with, consistent with the outcome of the preliminary examination.

handgun. Following Sergeant Molnar's testimony, the prosecutor explained that the information regarding the Glock handgun should have been redacted from the ballistics report. The prosecutor stated that the Glock had defendant's DNA on it, but was not suspected to be one of the guns used in the shooting on Prairie Street. The prosecutor then stated that the DNA report from Jennifer Jones would be altered to exclude information regarding the Glock. The trial court clarified as follows:

> *The Court*: It doesn't have anything to do with this?
>
> [*The Prosecution*]: No.
>
> *The Court*: Okay.
>
> [*Defense Counsel*]: Correct.
>
> *The Court*: Oh, so it should have been redacted, and he shouldn't have been talking about the Glock?
>
> [*The Prosecution*]: Yes.
>
> *The Court*: Because I was a little confused hearing about the Glock.

Defendant contends that "juror confusion can cause prejudice taking attention away from key points of merit of defense [sic]." Defendant presents no further legal support for this argument. An appellant may not merely "announce a position or assert an error and then leave it up to the Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position." *People v Kevorkian*, 248 Mich App 373, 389; 639 NW2d 291 (2001). Accordingly, defendant has abandoned his argument.

## 4. INEFFECTIVE ASSISTANCE OF COUNSEL

Finally, defendant argues that trial counsel was ineffective for failing to call a ballistic expert to testify at trial. We disagree.

To preserve a claim of ineffective assistance of counsel, a defendant must either move for a new trial or for a *Ginther*[4] hearing in the trial court. See *People v Lopez*, 305 Mich App 686, 693; 854 NW2d 205 (2014). A defendant can also preserve such issues "by filing in this Court a motion for remand to the trial court for a *Ginther* hearing." *People v Abcumby-Blair*, 335 Mich App 210, 227; 966 NW2d 437 (2020), lv den 508 Mich 945 (2021). Defendant has not moved for a new trial or a *Ginther* hearing in this Court or the trial court; thus, our review is limited to errors apparent on the record. *People v Unger*, 278 Mich App 210, 253; 749 NW2d 272 (2008).

---

[4] *People v Ginther*, 390 Mich 436, 443; 212 NW2d 922 (1973).

A defendant who seeks to establish a claim of ineffective assistance of counsel must show "that (1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that the outcome would have been different." *People v Trakhtenberg*, 493 Mich 38, 51; 826 NW2d 136 (2012). Counsel is presumed to be effective and defendant bears the burden of proving otherwise. *People v Isrow*, 339 Mich App 522, 531; 984 NW2d 528 (2021). Defendant likewise bears the burden to establish the factual predicate for the claim. *People v Hoag*, 460 Mich 1, 6; 594 NW2d 57 (1999).

The decision to retain an expert witness is a matter of trial strategy. *People v Payne*, 285 Mich App 181, 190; 774 NW2d 714 (2009). Here, defendant states that an expert could have addressed what he considered "discrepancies" in the testimony of forensic technician Margaret Lovallo, indicating that the shooting of Coleman did not occur inside the house on Prairie Street. According to the Standard 4 brief, the testimony at issue allegedly comes from the preliminary examination of "codefendants," although defendant does not identify those codefendants or direct us to any information about the case to which he refers. Defendant likewise has not provided this Court with a copy of the preliminary examination transcript, nor does he explain what the discrepancies at issue are, or what a ballistics expert could have specifically proven. We thus find that defendant has failed to establish the factual predicate for this portion of his claim. *Hoag*, 460 Mich at 1.

Defendant also states that an expert could have been called to rebut the testimony offered by Sergeant Molnar. Sergeant Molnar testified that the Smith & Wesson handgun found at the scene could not have fired the bullet that killed Coleman. Later, DNA expert witness Jennifer Jones testified that defendant's DNA was on the Smith & Wesson handgun. Thus, the prosecution's own expert witnesses implied that defendant could not be conclusively linked to the gun or the bullet used to kill Coleman. Nevertheless, the jury still elected to convict defendant of second-degree murder. Defendant does not elaborate as to what a ballistics expert would have testified to, and perhaps more importantly, offers no proof that an expert would have testified favorably if called by defense counsel. Again, defendant fails to establish the factual predicate for his claim. *Id.*

Even if we were to conclude that defense counsel's performance was constitutionally deficient, defendant cannot establish that he was prejudiced by her failure to call a ballistics expert. Regarding the failure to call an expert to testify to discrepancies in the evidence, we note that at trial, Wilson testified that he was chased in the house by a man with a gun, and that he grabbed the gun when the man dropped it. However, at no point did Wilson testify that anyone opened fire while inside the house, except when he fired a gun through the upstairs window, which multiple witnesses agreed had been broken out. This corroborates Lovallo's alleged testimony that there were no signs of a gunfight in the house. There is no indication that the outcome of the case would have been different had defense counsel called an expert to rebut this alleged testimony.

Additionally, regarding the claim that an expert witness should have been called to rebut Sergeant Molnar's testimony, it bears repeating that the jury still convicted defendant of second-degree murder even though the prosecution's expert witness suggested that the firearm containing defendant's DNA could not have fired the bullet that killed Coleman. There is no evidence that additional testimony from a competing defense expert would have changed the outcome of this case. Accordingly, defendant's claim must fail.

Affirmed.

/s/ Anica Letica
/s/ Michelle M. Rick
/s/ Mariam S. Bazzi